COURT OF APPEALS

SECOND DISTRICT OF TEXAS

FORT WORTH

NO. 2-06-132-CV

WILLIAM LOWE, M.D. APPELLANT

V.

MARY HERNANDEZ APPELLEE

------------

FROM THE 96TH DISTRICT COURT OF TARRANT COUNTY

------------

MEMORANDUM OPINION
(footnote: 1)

------------

I.  Introduction

In five issues, Appellant William Lowe, M.D. asserts that the trial court erred in awarding judgment, following a jury trial, to Appellee Mary Hernandez for a job termination claim following a course of surgical and medical treatment provided by Dr. Lowe.  We affirm.  

II.  Factual and Procedural Background

This is the case of the five-pound mistake.  

A. Hernandez’s Employment and Her Injury

Hernandez was first employed by Calico Corners (“Calico”) in 1987 as a part-time salesperson.  She was promoted after a few months to full-time salesperson, and then eventually to store manager three or four years later.  In the spring of 2001, Calico employed the fifty-four year old Hernandez as the manager of its retail fabric store in the Ridgmar Mall area of Fort Worth.  Whether as a salesperson or the store manager, one of the functions of her job during her fourteen years with Calico was to maintain the physical ability to lift, control, and carry heavy and bulky merchandise weighing up to fifty pounds for a majority of her scheduled work hours.  As store manager, she was responsible for enforcing this administrative standard through the recruitment, hiring, training, review, and annual performance appraisal of each member of the store staff.  Hernandez was responsible for managing the store in a manner resulting “in retail sales generating the optimum profit on a continuing basis.”  During this time Hernandez would, on occasion, leave the store to visit a customer’s home for the purpose of calculating the yardage of fabric required for a particular decoration project.  On April 17, 2001, during just such a visit, she fell and broke her left wrist.

B. Dr. Lowe

The doctor who treated Hernandez in the emergency room referred her to Dr. Lowe, a board-certified orthopedic surgeon specializing in hand and lower arm procedures.  Seeing her the next day at The Bone and Joint Clinic (“the Clinic”),
(footnote: 2) Dr. Lowe diagnosed Hernandez as suffering from a displaced distal radius fracture with comminution.  He recommended that she undergo an open reduction procedure with internal fixation.

On April 20, 2001, Dr. Lowe performed successful surgery to repair the fracture and realign the bone and joint by internal fixation.  Hernandez had no complaints about the surgery.  Post-operatively, he anticipated that the wrist would remain in a cast for three to four weeks.  Not only did the bone require healing, but all the soft tissues, tendons and ligaments required time and therapy to recover fully from the injury.  During Hernandez’s first post-operative office visit, on April 30, 2001, Dr. Lowe noted proper alignment and healing, with lessening, if unresolved, pain. 

Because the injury was work-related, Hernandez was eligible for, and claimed and received, worker’s compensation benefits.  Sentry Insurance Company (“Sentry”) was the worker’s compensation carrier for Calico.  Sentry used Cross Rehabilitation as its medical consultants.  Throughout the course of her treatment by Dr. Lowe and other physicians, Hernandez routinely discussed the status of her medical condition and work situation with not only Sentry’s adjuster, Fredda Fitzpatrick, but also with the Cross Rehabilitation consultant assigned to handle Hernandez’s case, registered nurse Sara Sorhabi, as well as her Human Resources contacts at Calico, Kimberly McKeown and Renae Long. Sohrabi made some of Hernandez’s doctor appointments and accompanied her to those appointments, including her follow-up visits with Dr. Lowe.  Sohrabi worked closely with Dr. Lowe to help Hernandez make informed choices about her medical treatment.

C. Work Status Reports 

Hernandez testified that during her recovery she relied upon Dr. Lowe’s instructions concerning when she should return to work and what job activities she could perform without hindering her recovery.  Throughout Hernandez’s recovery, Dr. Lowe completed the required Texas Workers’ Compensation Work Status Reports (“WSRs”), which Dr. Lowe knew required accuracy in their completion.  He testified that at the Clinic, he had the staff complete the top part of the WSR; he would then add the restrictions, review, and sign them.  A WSR is a form report concerning a patient’s current physical and psychological status, filled out and signed by a treating physician and sent to the patient’s employer periodically—usually with each office visit—to advise the employer of the employee’s medical progress and ability to perform certain physical functions.  However, a WSR is not a final determination of a patient’s capacity to return to a particular job.  Dr. Lowe was aware that these WSRs would go to the patient’s employer.

Though the WSR represents the treating physician’s professional assessment of the patient’s ability to function from a medical standpoint, information from the patient herself is critical to his determination of whether or with what restrictions, if any, she may return to work.  Ultimately, the patient and her employer decide whether she can return, comparing the physical or psychological requirements of the job with the restrictions identified by the physician.  How an employer may use the information contained in a WSR with regard to a specific patient is not something of which the doctor becomes aware unless disclosed by the patient or employer.

During her first post-operative office visit, Dr. Lowe initally filled out the WSR to indicate that Hernandez was not medically capable of returning to work and that he would reevaluate her on June 1, 2001.  Hearing this evaluation as he wrote it, Hernandez stopped Dr. Lowe and specifically requested that he let her return to work despite her left arm restrictions because she was capable of performing her job under the circumstances.  Based upon this representation, Dr. Lowe crossed out his previous statement on the form and wrote that Hernandez could return to work as long as she did not use her left arm.

At no time did Dr. Lowe suggest to Hernandez that she could not come to him with questions about her condition, treatment, or paperwork, and Hernandez regularly communicated with the individuals responsible for providing her workers’ compensation benefits concerning her medical condition and work situation.

Based upon the first WSR prepared by Dr. Lowe, Hernandez returned to work restricted from performing any lifting or carrying with her left wrist. Hernandez returned to work as soon as she could after her surgery and worked with restrictions throughout her rehabilitative period.  When she returned, she followed Dr. Lowe’s instructions and attended all of the therapy sessions prescribed by him.  Calico modified Hernandez’s previous work schedule in accordance with Dr. Lowe’s temporary work restrictions, and allowed Hernandez to have other employees assist her in lifting material so that she would not re-injure her wrist.

Over the course of her eight months of recovery, Hernandez continued to follow Dr. Lowe’s instructions.  She gradually became able to perform more job functions with her wrist, and made continual progress towards attaining the fifty-pound lifting requirements of her job.  Sohrabi also continued to monitor Hernandez’s progress and attended doctor appointments with her.  At the end of each appointment, Dr. Lowe would fill out a WSR that informed Calico of Hernandez’s progress and what restrictions he placed on her work activities.

D. Lifting Restriction 

Only after her July 9, 2001 office visit did Dr. Lowe “up” Hernandez’s lifting restriction from none to a two-pound weight limit for no more than an eight-hour work day.  He subsequently increased this weight restriction to five pounds after the August 13, 2001 office visit, but extended the restriction from her left wrist to her left arm due to evolving complaints and problems with her left shoulder function.  These occurred about three to four months into her recovery when Hernandez began experiencing pain in her shoulder, for which Dr. Lowe referred her to Joseph Milne, M.D., a board-certified orthopedic surgeon specializing in procedures of the shoulder, knee, and elbow.

Hernandez saw Dr. Milne on August 23, 2001.  Answering the “Simple Shoulder Test” form provided for physical complaint and medical history purposes, Hernandez confirmed that, although she could lift eight pounds to the level of her shoulder without bending her elbow, she could not carry twenty pounds at her side with her left arm nor work full time at her regular job. Completing the “Patient Self Evaluation” form provided contemporaneously with the “Simple Shoulder Test” form, Hernandez complained of left shoulder pain, both during the day and at night, wrote that the “hardest thing she had to do at work/home” was “heavy lifting” and that “lifting heavy bolts of fabric” was the activity that caused her shoulder to hurt.  Asked to rate her ability to perform routine tasks with her affected shoulder, she rated only her ability to comb her hair as “normal.”  She further conceded “difficulty” in using her hand with her left arm at shoulder level and her ability to eat with a utensil “only with aid.”  Finally, she rated herself “unable” to carry ten to fifteen pounds with her left arm at her side, to use her left hand overhead, to do any lifting, or to perform her usual work.

In providing an oral history to Dr. Milne, Hernandez attributed “persistent shoulder pain” to her original injury of April 17, 2001.  She also complained of left shoulder pain when “lifting” or reaching behind her back.  Based upon his physical examination of Hernandez, Dr. Milne described her as suffering from both persistent shoulder pain and weakness, and recommended that she undergo an MRI to rule out any rotator cutoff pathology.  Since this left shoulder injury was asserted to be work-related, he prepared a WSR permitting Hernandez to return to work with a weight lifting restriction of no more than five pounds.  Dr. Milne did not give Hernandez any work restrictions specifically for her shoulder.  She pursued her shoulder rehabilitation treatment conscientiously.

Following the MRI and based upon her MRI results, Dr. Milne diagnosed Hernandez on September 11, 2001 with a rotator cuff tear of her left shoulder.  A cuff tear makes it very difficult to lift the arm overhead.  After discussing the risks and benefits of conservative management versus repairing the cuff arthroscopically with Dr. Milne, Hernandez declined to undergo surgical therapy, opting to focus more on further rehabilitation of her left hand and wrist.  Though the record does not reflect that Dr. Milne prepared a WSR for this office visit, Dr. Lowe prepared one after seeing Hernandez on September 17, 2001 that specifically addressed her left shoulder injury and continued in effect the five-pound weight lifting restriction for her left arm.

Dr. Milne last saw Hernandez on October 23, 2001.  Though she reported her shoulder was doing well overall and professed her ability to do most activities as desired, upon physical examination, Dr. Milne noted she still experienced “some weakness to elevation” though with minimal pain.  He again discussed with her the risks and benefits of conservative management versus operative treatment, and she again declined surgery.  He finally specified no work restrictions for her shoulder, though he acknowledged that her “overall” work restrictions were dependent upon Dr. Lowe’s next evaluation of her hand and wrist.  Although the Work Status Information section of the WSR form provided space for Dr. Milne to state that Hernandez could return to work on a certain date without any restrictions, the record does not reflect that Dr. Milne ever prepared a final WSR releasing her.

After his last office visit with Hernandez on November 19, 2001, Dr. Lowe addressed both her left wrist and her left shoulder injury in his preparation of the WSR, specifically referring to both the “fracture” and the “rotator cuff” in the General Information Section of the form.  During the visit, Hernandez proclaimed herself happy with the recovery of her wrist; though she confessed to occasional aches and pains, she told Dr. Lowe that they were improving and she was able to do her job under the circumstances.  Since she had elected not to undergo corrective shoulder surgery for her torn rotator cuff, Dr. Lowe concluded that she needed to be evaluated at Maximum Medical Improvement (“MMI”) and thereby establish the date after which she no longer needed medical care for her work-related injuries.  An evaluation at MMI requires (1) a Functional Capacity Examination (“FCE”) to determine the functional capacity of the patient for her return to work and (2) a formal finding of the patient’s impairment rating which determines the employee’s compensation for her work-related injury.

Dr. Lowe told Hernandez and Sohrabi, and made a chart note for Hernandez’s November 19, 2001 exam, that upon receiving the FCE results, he would update Hernandez’s work restrictions and place any permanent restrictions on her work activities.

E. Hernandez’s Permanent Work Restrictions 

With respect to Hernandez’s permanent work restrictions, Dr. Lowe testified that his plan was as stated in the November 19, 2001 chart note: “once [the FCE] is done and we see a report, we can give [Hernandez] some permanent work restrictions.”

To determine her actual, permanent work restrictions at MMI, Dr. Lowe referred Hernandez to Cooper & Bush Physical Therapy for her FCE.  In attendance during this office visit, Sorhabi scheduled the FCE for November 27, 2001.  Pending completion of the FCE, Dr. Lowe prepared a WSR that retained the five-pound weight restriction previously imposed on Hernandez for lifting and added an additional motion restriction completely prohibiting “overhead reaching.”  Despite intending these restrictions to be subject to final revision pending the FCE, and being understood by Sorhabi in this manner, Dr. Lowe described these restrictions as “permanent” on the November 19, 2001 WSR. As always, Calico received the WSR.  As part of the Clinic’s normal routine in processing workers’ compensation paperwork, Dr. Lowes office note of November 19, 2001 was sent to Sentry. 

Dr. Lowe testified at trial that it was a mistake to write “permanent” on Hernandez’s workers’ compensation WSR before he reviewed her FCE report.  He also testified that he failed to review the FCE report or update Hernandez‘s work restrictions at any time before August 2002, although the assessment had been in her chart for some eight months.  He further stated that he did not review Hernandez’s chart properly before he filled out Hernandez’s long-term disability report for Reliance Insurance.  The effect of all this was that he reported that Hernandez had a permanent five-pound lifting restriction.

Because she needed an impairment rating that took into consideration both her wrist and shoulder injuries, and Dr. Lowe limited his practice to impairment ratings for hand injuries, he referred Hernandez to another orthopedic surgeon at the Clinic, Joseph H. Gaines, M.D., whose practice included impairment ratings for both hand and shoulder injuries.  The impairment rating determined the percentage of permanent impairment to the whole body.

Though physically given the WSR when she left the Clinic, Hernandez did not question Dr. Lowe about his designation of her work restrictions as “permanent.”  Hernandez never told Dr. Lowe that the weight restrictions under which she had been working since May failed to meet the lifting requirements for her job and put her at risk for termination.  Hernandez faxed the November 19, 2001 WSR, as well as notification of the two additional evaluations she was to undergo, to Renae Long, one of Hernandez’s Human Resources contacts at Calico.

As scheduled, Hernandez underwent the FCE on November 27, 2001 and the MMI impairment rating on November 28, 2001.  Hernandez went to the Cooper & Bush Physical Therapy Clinic in Fort Worth for her FCE—the test Dr. Lowe needed to make his final assessment and formulate her permanent work restrictions.  Contrary to her representations during her last visit with Dr. Lowe, Hernandez gave a medical history to the physical therapist that included continuing intermittent pain in the left wrist and occasional shoulder pain, an inability to close her fingers, weakness in her grip and “decreased” lifting ability.  She also described the “material handling requirements” of her job as lifting thirty to fifty pounds from floor to knuckle, knuckle to shoulder and shoulder to overhead, as well as carrying the same weight fifty feet, all five to ten times per day.  The examination concluded that she could partially lift up to fifty pounds at work.  Specifically, the FCE demonstrated that, although she could lift fifty pounds from floor to knuckle, Hernandez could only lift eighteen pounds for fifty feet.  It also documented her inability to lift more than ten and forty pounds overhead with her left and right arms, singly and respectively.  Finally, the FCE attributed to Hernandez a statement that these weights would be sufficient for most of the lifting required by her employment, and that she was able to recruit help from her staff when the bolts of fabric were too heavy.  Though she did not recall making this statement at trial, Hernandez confirmed that it accurately described exactly what had been occurring during the entirety of her recovery in 2001.

Cooper & Bush sent this report to Dr. Lowe approximately one week later, and Dr. Lowe signed the report.  Although Dr. Lowe was supposed to use this report to update Hernandez’s lifting restrictions and establish her permanent work restrictions, he did not.  From Calico‘s standpoint, this left Hernandez with the November 19, 2001 WSR stating that she had a permanent five-pound maximum work restriction.  Dr. Lowe was sent a copy of the FCE; Hernandez was not sent a copy.  Hernandez did not receive the results of the FCE showing that she could lift up to fifty pounds from floor to knuckle until the late summer of 2002.  The results of the FCE also documented that Hernandez could not meet the lifting requirements for some lifts over seven months after the underlying accident without substantial assistance from her staff.

After seeing her and preparing his impairment rating on November 28, 2001, Dr. Gaines certified, by a Report of Medical Evaluation dated December 5, 2001, that Hernandez had reached MMI on the earlier date.  Employing the fourth edition of the 
Guides to the Evaluation of Permanent Impairment
 published by the American Medical Association (AMA), he further posited a whole body impairment rating for Hernandez of twelve percent, consisting of a total left hand impairment rating of ten percent and a total left shoulder impairment rating of two percent. 

Dr. Lowe signed both the FCE and the MMI impairment rating prepared by Dr. Gaines.  He had intended to amend the November 19, 2001 WSR in accordance with these results when he received them, but did not do so due to an oversight. He claimed the process maintained by the Clinic somehow did not get instituted as usual so he did not receive all the relevant paperwork with the FCE. 

F. Hernandez’s Termination   

In mid-December 2001 Hernandez’s supervisor, Ginny Lewis, informed her that Calico intended to terminate her employment effective December 31, 2001, due to the classification of her work restrictions as “permanent” by Dr. Lowe on the November 19, 2001 WSR and her resulting inability to lift and control fifty pounds as required by her job description.  Characterizing her firing as a “voluntary” termination, her Employee Separation Report stated the following explanation of its grounds: “Unable to perform Essential Functions of the job as outlined in Store Manager Job Description.  Permanent Lifting restrictions assigned in November 2001 - No Lifting over 5lbs.”

Despite having just obtained the more favorable, if still substandard results of her FCE, Hernandez did not inform Lewis of this assessment or attempt to obtain a copy to provide to Calico to rebut the grounds for her termination.  Nor did she immediately contact either the Sentry adjuster, Fitzpatrick, or her claim manager, Sorhabi, to enlist their help in obtaining an amended WSR, though she specifically “thought about” enlisting the assistance of these individuals.  Hernandez never contacted Dr. Lowe in any manner, or sought assistance from any Clinic employee, before her last day of work on December 31, 2001.  Hernandez decided not to contact Dr. Lowe because she felt that he would not have helped her by amending the report.  Similarly, no individual from Calico contacted or attempted to contact Dr. Lowe before her last day of work.

Nevertheless, Sohrabi left several messages with Dr. Lowe’s office attempting to learn the results of the FCE, but Dr. Lowe never returned any of her calls.

Hernandez professed that she had no idea that Calico considered her work accommodations throughout 2001 as only “temporary.”  She further never conveyed any such concern to Dr. Lowe during her course of treatment.

Stunned by her termination, Hernandez tried to convince her supervisor, Lewis, that she could in fact lift up to fifty pounds.  Because she could get no help at the local level, Hernandez contacted McKeown, the Human Resources Manager for Calico’s parent company, Everfast, Inc.  She also requested, as an alternative, to be given any position at Calico even if she could not be a manager.  Calico told her that all positions required the ability to lift up to fifty pounds.  She continued to plead with Calico that she could lift fifty pounds and requested that Calico revisit its decision to terminate her.  To honor Hernandez’s request, McKeown wrote a letter dated January 29, 2002 to Dr. Lowe stating:

Our office is in receipt of a note from your office, copy attached, dated November 19, 2001 indicating that Ms. Hernandez could return to work with restrictions.  You indicated on the Texas Workers’ Compensation Status Report that her restrictions were permanent and included no overhead reaching and lifting/carrying greater than 5 lbs for more than 8 hours per day.

Can you please confirm that these restrictions are indeed permanent and do limit her lifting to no more than 5 lbs?  Ms. Hernandez has advised us that these are incorrect and we have made employment decisions based on these facts.

Your prompt response is greatly appreciated and if you have questions, please give me a call.

Dr. Lowe did not respond to McKeown’s letter.  McKeown made additional follow-up phone calls, but Dr. Lowe did not take or return these calls.

McKeown did not inform Dr. Lowe that Calico had fired Hernandez.  The January 29 letter specifically referred to Hernandez as “our employee.”  Dr. Lowe stated that he never saw this letter, nor did be become aware of its existence, or of the firing of Hernandez, until after he received the notice letter concerning the health care liability claim she intended to and eventually filed against him in 2003.  On February 6, 2002, McKeown reported that she finally spoke with Dawn Stanberry, the Clinic employee responsible for workers’ compensation paperwork.  Stanberry stated that Dr. Lowe told her that the restrictions were indeed permanent.  Based upon this information, Hernandez was not eligible to be rehired because she did not meet the requirement of being able to lift up to fifty pounds, so McKeown advised Hernandez to apply for long-term disability with Reliance Standard Life Insurance (“Reliance Insurance”).  Hernandez took the advice and sent her application to Reliance Insurance.

Additional testimony from Dr. Lowe revealed that he did not return telephone calls from Sohrabi or McKeown.  Dr. Lowe admitted that he remembered telling Stanberry that Hernandez’s restrictions were permanent when McKeown called him in January 2002 to clarify the November 19, 2001 WSR.  Dr. Lowe testified that the error concerning the WSR would not have occurred had he simply taken a few minutes to review his patient’s chart.  He also admitted that he never corrected the WSR or the long-term disability insurance form.  As of the date of trial, Hernandez was still working under the erroneous WSR that states she is permanently restricted from lifting over five pounds at work.

After receiving Hernandez’s application for long-term disability, Relaince Insurance wrote Dr. Lowe.  Reliance Insurance requested Hernandez’s medical records and that Dr. Lowe fill out its medical questionnaire.  On February 28, 2002, Dr. Lowe again wrote that Hernandez could only lift five pounds and that the restriction was permanent, but he did not review the FCE in her chart that clearly stated Hernandez’s ability to lift fifty pounds.

G. Hernandez’s Financial Hardship

To pay her bills, Hernandez was able to find work at Gabberts, a retail furniture store, as a salesperson.  Her compensation with Gabberts was much less than her salary at Calico.  When Hernandez’s compensation at Gabberts went to commission only, Hernandez knew that her income would decrease dramatically, and she was forced to find a new job.  Herenandez went to work for Ashley Furniture as a salesperson.  Initally, her wages were much less than they had been with Calico.  To make ends meet, Hernandez cashed in her retirement and savings accounts to pay for her basic living expenses and used loans and credit cards to buy food and pay her mortgage.

Because of financial worries, Hernandez developed physical symptoms directly related to stress.  She could not sleep; she had frequent headaches and backaches.  The stress of her job loss and financial problems also aggravated her diabetes.

In the summer of 2002, Hernandez was still waiting on her long-term disability claim to be approved.  On July 29, 2002, Reliance Insurance sent Hernandez a rejection letter.  The letter states in pertinent part:

[W]e would like to point out that the functional capacities examination conducted on November 27, 2001, revealed a functional lifting level of 50 pounds, which you yourself documented as being sufficient in meeting the demands of your job.  As a result, it is apparent that while you were not considered Totally Disabled from performing the material duties of your occupation, you were also capable of performing your particular job at the exertion level you suggested.

After her workers’ compensation benefits expired and her former employer’s long term disability insurer denied her claim for benefits in August 2002, Hernandez sought a clarification of her work restrictions directly from Dr. Lowe.

Apparently, for the first time, Dr. Lowe reviewed the FCE and noted in her chart that Hernandez could lift fifty pounds.  He also noted that the November 19, 2001 workers’ compensation WSR, which he had written, reviewed, and signed, showed a five-pound lifting restriction instead of fifty pounds.  He attempted to explain the error with the explanation in a chart note sent to Hernandez that the staff made an error in leaving off the zero on the end of the five-pound restriction.

Hernandez contacted Calico to see if she could have her old manager’s job back but was informed she was too late; Calico had already hired someone to take her place. 

H. Procedural History 

On May 13, 2003, Hernandez sued Dr. Lowe for the termination of her employment by Calico, specifically alleging that Dr. Lowe proximately caused her firing by negligently misreporting her functional capacity to Calico and failing to correct this error when requested.  Asserting negligence, respondeat superior, defamation and gross negligence theories of liability, she sought actual damages for lost earnings in the past and future, and emotional distress and exemplary damages.  Hernandez sent Dr. Lowe a notice letter in January 2003 and filed both a cost bond and a preliminary expert report pursuant to former Texas Revised Civil Statute Article 4590i section 13.01
(footnote: 3), the latter alleging medical negligence against Dr. Lowe and asserting a causal connection between such negligence and the wrongful termination of her employment.  Dr. Lowe generally denied each and every allegation.

Before the case went to trial, Hernandez abandoned the defamation and gross negligence claims, and later her respondeat superior claims based upon the alleged negligence of Clinic employees.

The case went to trial before a jury on February 2, 2006.  At the conclusion of the trial on the merits, the jury returned a verdict in favor of Hernandez, finding Dr. Lowe one hundred percent negligent and declining to find any contributing negligence on the part of Hernandez.  The jury awarded damages in the amount of $179,589; $28,589 for lost wages and $150,000 for past mental anguish.  Hernandez moved for and the trial court granted a final judgment on the verdict.  Due to an error in the calculation of prejudgment interest, Hernandez filed a motion for judgment nunc pro tunc, which was granted by the entry of a corrected judgment.

Dr. Lowe subsequently filed a motion for judgment notwithstanding the verdict asserting that Hernandez failed to present any expert testimony regarding cause in fact and reasonable foreseeability and failed to present any legally or factually sufficient evidence on cause in fact or reasonable foreseeability from any source.  The trial court overruled the motion.

Dr. Lowe then filed a motion to modify the judgment, or alternatively, motion for new trial.  The court overruled this motion as well.  Dr. Lowe then perfected this appeal.

III.  Legal and Factual Sufficiency

In his first issue, Dr. Lowe argues that the evidence of the “causal relationship between the five pound lifting restriction imposed by Dr. Lowe and the termination of her employment, given her incontrovertible inability to meet the fifty pound lifting requirement for her position,” was both legally and factually insufficient.

A.  Standards of Review

A legal sufficiency challenge may only be sustained when:  (1) the record discloses a complete absence of evidence of a vital fact; (2) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact; (3) the evidence offered to prove a vital fact is no more than a mere scintilla; or (4) the evidence establishes conclusively the opposite of a vital fact.  
Uniroyal Goodrich Tire Co. v. Martinez
, 977 S.W.2d 328, 334 (Tex. 1998),
 cert. denied
, 526 U.S. 1040 (1999);
 Robert W. Calvert, 
“No Evidence”
 
and “Insufficient Evidence” Points of Error
, 38 T
EX
. L. R
EV
. 361, 362–63 (1960)
.  In determining whether there is legally sufficient evidence to support the finding under review, we must consider evidence favorable to the finding if a reasonable factfinder could, and disregard evidence contrary to the finding unless a reasonable factfinder could not.
  
City of Keller v. Wilson
, 
168 S.W.3d 802, 827
 (Tex. 2005). 

An assertion that the evidence is factually insufficient to support a fact finding means that the evidence supporting the finding is so weak or the evidence to the contrary is so overwhelming that the answer should be set aside and a new trial ordered.  
Garza v. Alviar
, 395 S.W.2d 821, 823 (Tex. 1965).  We are required to consider all of the evidence in the case in making this determination, not just the evidence that supports the finding.  
Mar. Overseas Corp. v. Ellis
, 971 S.W.2d 402, 406–07 (Tex.), 
cert. denied
, 525 U.S. 1017 (1998).

B. Application

Dr. Lowe initially asserts that expert testimony was required to establish the causal relationship between the erroneous documentation and any damage allegedly caused thereby.  We first observe that 

A cause of action against a health care provider is a health care liability claim under the MLIIA
(footnote: 4) [Medical Liability Insurance Improvement Act], if it is based on a claimed departure from an accepted standard of medical care, health care, or safety of the patient, whether the action sounds in tort or contract.  A cause of action alleges a departure from accepted standards of medical care or health care if the act or omission complained of is an inseparable part of the rendition of medical services.

Emeritus Corp. v. Highsmith
, 211 S.W.3d 321, 327 (Tex. App.—San Antonio 2006, pet. denied) (citing 
Diversicare Gen. Partner, Inc. v. Rubio
, 185 S.W.3d 842, 848 (Tex. 2005)).  

Dr. Lowe asserts that the assessment of a patient’s ability to return to work and function, the preparation of the documents required for that assessment and, as phrased by Dr. Lowe, “what happens to a patient as a result of that medical assessment and submission of documentation are matters outside the common knowledge of the lay public that require expert medical testimony.”  For these assertions Dr. Lowe cites 
Hart v. Van Zandt
, 399 S.W.2d 791, 792 (Tex. 1965) (stating that when “determining negligence in a case . . . which concerns the highly specialized art of treating disease, the court and jury must be dependent on expert testimony”); 
Bowles v. Bourdon
, 148 Tex. 1, 5, 219 S.W.2d 779, 782 (1949) (stating the same); and 
Connor v. Waltrip
, 791 S.W.2d 537, 539 (Tex. App.—Dallas 1990, no writ) (stating that a summary judgment may be based on the uncontroverted testimonial evidence of an interested expert witness concerning the subject matter on which the trier of fact must be guided solely by expert testimony). 

Hernandez responds that her negligence claim against Dr. Lowe involves non-medical, administrative or ministerial acts from a physician and does not require expert testimony because the jury is competent from its own experience to determine and apply a reasonable standard of care, citing 
St. Paul Med. Ctr. v. Cecil
, 842 S.W.2d 808, 812 (Tex. App.—Dallas 1992, no writ) (stating that the standard of non-medical, administrative, ministerial, or routine care at a hospital need not be established by expert testimony because the jury is competent from its own experience to determine and apply such a reasonable-care standard); 
Golden Villa Nursing Home, Inc. v. Smith
, 674 S.W.2d 343, 349 (Tex. App.—Houston [14th Dist.] 1984, writ ref’d n.r.e.) (stating same).  Hernandez asserts that under the facts of this case, lay testimony is adequate to prove causation because the jury’s general experience and common sense will enable them to determine with reasonable probability the causal relationship between the erroneous documentation and her termination, citing 
Morgan v. Compugraphic Corp.
, 675 S.W.2d 729, 733 (Tex. 1984) (stating the principle that lay testimony is adequate to prove causation in those cases in which general experience and common sense will enable a layman to determine, with reasonable probability, the causal relationship between the event and the condition).  We agree.    

Hernandez points us to the following evidence, in part: 

Dr. Lowe reviewed the WSRs that he and his staff completed and then signed them.

The WSRs informed Calico of Hernandez’s temporary work restrictions, which dictated what she could temporarily do on the job.

On November 19, 2001, Hernandez had her final appointment with Dr. Lowe and he signed a WSR that stated Hernandez could only lift five pounds.  The report said that the restriction was permanent. 

Dr. Lowe then instructed Hernandez to have a FCE peformed so he could determine what permanent restrictions would be required. 

Dr. Lowe made a chart entry after the November 19, 2001 appointment that stated he would need to review the FCE once it was completed.  After reviewing the results, he would then assign permanent work restrictions for Hernandez.

Dr. Lowe received and signed the FCE around the first week of December 2001.

Dr. Lowe did not review Hernandez’s chart or the FCE until August 2002, approximately eight months after Hernandez had the examination.

Hernandez’s Employee Separation Report stated the reason for her separation from Calico was that she was “unable to perform essential functions of the job as outlined in the store manager job description.  
Permanent lifting restrictions assigned on November 2001--No lifting over 5lbs
. [Emphasis added.]

Sohrabi’s calls to Dr. Lowe’s office concerning the results of the FCE went unanswered.

In mid-January 2002, McKeown wrote a letter to Dr. Lowe asking if the five pound lifting restriction was permanent because Calico had based employment decisions on that lifting restriction. McKeown received no response to her letter.

McKeown spoke to Stanberry, an employee of the Clinic.  Stanberry asked Dr. Lowe if the restrictions were permanent because Hernandez’s employer wanted to know.  Without reviewing the chart, Dr. Lowe told Stanberry “yes.”  Stanberry then passed this information on to McKeown.

In July 2002, Hernandez received a letter denying her long-term disability benefits.  Hernandez learned that her long-term disability was denied because her FCE showed that she could lift fifty pounds.

Hernandez went to Dr. Lowe’s office and he reviewed her chart and discovered the mistake.  In a chart note sent to Hernandez, Dr. Lowe surmised that the office staff must have left off a zero on the original report so the report stated “5” instead of “50” pounds for the permanent work restriction.

At trial, Lowe admitted that the permanent five pound restriction stated in the November 19, 2001 WSR was his mistake.

Dr. Lowe testified that his failure to review Hernandez’s chart when her employer called and when the insurance company sent him the form for long-term disability were also his mistakes. 

Dr. Lowe also testified that he could have corrected these clerical mistakes once he became aware of them, but simply failed to do so.  However, he never corrected her permanent restriction.  At the time of trial Hernandez was still working under the inaccurate November 19, 2001 WSR and was thus obligated to inform any employer of that permanent work restriction.

We cannot agree with Dr. Lowe’s assertion that a physician’s failure to properly document a patient’s status which subsequently caused her to be fired from her job must be proved by expert testimony.  This conclusion is further supported by the fact that the wording on the very document explaining Hernandez’s termination stated that her termination was due to the permanent five-pound lifting restriction.

Dr. Lowe next urges that “an employee cannot recover for her wrongful termination or retaliatory discharge if she sustains a work-related injury that prevents her from performing the essential functions of that position.”  Dr. Lowe attempts to analogize this negligence case to a wrongful termination case under the Texas Labor Code and asserts that Hernandez cannot recover if her employer had a legitimate reason to terminate her employment apart from the permanent five-pound lifting restriction.  This is not a wrongful termination case.  It is a negligence case, and we likewise reject Dr. Lowe’s attempt to alter the character of Hernandez’s cause of action.  A duck is a duck, not a chicken.
(footnote: 5) 

Dr. Lowe continues his argument, in essence, that Hernandez would have been fired anyway because her work-related injuries prevented her from performing the essential functions of her position.  Because this is a negligence case and not a wrongful termination case, an examination of the evidence, previously set forth in detail, clearly demonstrates that the evidence was sufficient, both legally and factually, for the jury to believe that Hernandez was fired because of the erroneous permanent five-pound lifting restriction.  We overrule Dr. Lowe’s first issue.  

IV.  Contributory Negligence

In his second issue, Dr. Lowe argues that he presented conclusive evidence of Hernandez’s contributory negligence and the jury’s failure to find such negligence is against the great weight and preponderance of the evidence.

A.  Standard of Review

In reviewing an issue asserting that a finding is “against the great weight and preponderance” of the evidence, we must consider and weigh all of the evidence and set aside the finding only if the evidence is so weak or the finding is so contrary to the great weight and preponderance of the evidence as to be clearly wrong and unjust.  
Dow Chem. Co. v. Francis
, 46 S.W.3d 237, 242 (Tex. 2001); 
In re King's Estate
, 150 Tex. 662, 244 S.W.2d 660, 661 (1951).

B. Application

The evidence, as detailed above, supports the jury’s finding that Hernandez was not negligent.  For example, the evidence showed that Hernandez relied upon Dr. Lowe to assess and accurately report her medical condition to Calico.  Hernandez also presented evidence of the steps she took to identify Dr. Lowe’s mistakes and to get them rectified from the time she was told she was being fired until months after she was terminated.  After considering and weighing all of the evidence, we cannot say that the evidence supporting the finding that Hernandez was not negligent is so contrary to 
the great weight and preponderance of the evidence that it is clearly wrong and unjust.  
Francis
, 46 S.W.3d at 242; 
King's Estate
, 244 S.W.2d at 661.
  We overrule Dr. Lowe’s second issue.

V.  Alleged Charge Errors

In his third, fourth, and fifth issues, Dr. Lowe asserts three separate errors in the charge of the court.  

A.  Standard of Review

Determining whether an instruction or definition is erroneous is based on an abuse of discretion standard, that is where the trial court acts arbitrarily or without reference to any guiding principle.  
Tex. Dep’t Human Servs. v. E.B.
, 802 S.W.2d 647, 649 (Tex. 1990).  To determine whether alleged charge error requires remand, the court must consider the pleadings, the evidence presented at trial, and the charge in its entirety.
  Island Recreational Dev. Corp. v. Republic of Tex. Sav. Ass’n
, 710 S.W.2d 551, 555 (Tex. 1986).  Charge error is reversible if it caused, or was reasonably calculated to cause, the rendition of an improper judgment.  
Id
.

B.  Reasonable Person Standard

Dr. Lowe first urges this court to find error in the charge of the court because the reasonable person standard was applied to Dr. Lowe as opposed to the standard utilized when a physician is charged with medical negligence. 

We have already determined that the actions of Dr. Lowe giving rise to the negligence claim were ministerial or administrative in nature, not requiring expert testimony because the acts were not of professional negligence, and hence the reasonable person standard was appropriate.  Dr. Lowe’s third issue is overruled.

C.  Employees’ Acts

Dr. Lowe next argues that the jury attributed the acts and omissions of the Clinic‘s employees to Dr. Lowe, which was improper because he was without contractual or supervisory authority to direct the details of their conduct.

In the charge, the court gave the following definition: “An ‘employee’ is a person in the service of another with the understanding, express or implied, that such other person has the right to direct the details of the work and not merely the result accomplished.”  However, no questions were asked of the jury, nor instructions given, involving this definition.  Further, Hernandez’s second amended original petition did not contain any vicarious liability allegations, and the evidence at trial showed that Dr. Lowe was an independent contractor and that the Clinic staff were not his employees.  While there was testimony at trial concerning the activities of the clinic staff in connection with the WSRs, the absence of questions or instructions regarding an “employee” leads us to hold that the inclusion of the definition was unnecessary and error.   However, to 
obtain reversal of a judgment based upon an error in the trial court, the appellant must show that (1) the error occurred; and (2) it probably caused rendition of an improper judgment, or probably prevented the appellant from properly presenting the case to this court.  T
EX
. R. A
PP
. P. 44.1(a); 
Romero v. KPH Consolidation
,
 Inc.
, 166 S.W.3d 212, 225
–
26 (Tex. 2005). 
  Here, extensive evidence previously recounted in this opinion supports the jury’s verdict, and we cannot say that an improper judgment occurred, or that Dr. Lowe was prevented from presenting his case, by the inclusion of this extraneous definition.  Thus, the error was harmless.  Dr. Lowe‘s fourth issue is overruled.

D.  Sole Proximate Cause

Lastly, Dr. Lowe asserts error in the charge through the trial court’s failure to include his requested definition of sole proximate cause.

According to Pattern Jury Charge 3.2, General Negligence, “sole proximate cause” is defined as follows: “There may be more than one proximate cause of an event, but if an act or omission of any person not a party to the suit was the ‘sole proximate cause’ of an occurrence, then no act or omission of any other person could have been a proximate cause.  2 
Comm. on Pattern Jury Charges, State Bar of Tex., Texas Pattern Jury Charges 
PJC 3.2 (2006).  “Sole proximate cause” is an inferential rebuttal and should be submitted to the jury if there is evidence that a person’s conduct that is not submitted to the jury is the sole proximate cause of the occurrence.  
See Am. Jet, Inc. v. Leyendecker
, 683 S.W.2d 121, 126 (Tex. App.—San Antonio 1984, no writ); 
Herrera v. Balmorhea Feeders, Inc.
, 539 S.W.2d 84, 86 (Tex. Civ. App.—El Paso 1976, writ ref’d n.r.e.).  Submission of the inferential rebuttal is improper and may be reversible error if there is no such evidence.  
See Huerta v. Hotel Dieu Hosp.
, 636 S.W.2d 208, 209–10 (Tex. App.—El Paso), 
rev’d on other grounds
, 639 S.W.2d 463 (Tex. 1982).  

Dr. Lowe argues that he submitted evidence that both Calico and the Clinic staff were sole proximate causes of Hernandez’s termination.  This, of course, is not possible because there cannot be two sole proximate causes.  Nevertheless, and construing the arguments in the alternative, the record is also replete with evidence of Dr. Lowe’s negligence and causation, as previously set forth in this opinion, including the Calico report citing the permanent five-pound lifting restriction as the reason for Hernandez’s termination.  Therefore, returning to the definition of sole proximate cause, Dr. Lowe’s negligence and causation negate the inferential rebuttal’s requirement that “no act or omission of any other person could have been a proximate cause.”  We overrule Dr. Lowe’s final issue.

VI.  Conclusion

Having overruled all of Dr. Lowe’s issues, we affirm the trial court‘s judgment.

BOB MCCOY

JUSTICE

PANEL B: DAUPHINOT, WALKER, and MCCOY, JJ.

WALKER, J. concurs without opinion.

DELIVERED: June 7, 2007

FOOTNOTES
1:
See
 
Tex. R. App. P.
 47.4.

2:
Dr. Lowe joined the physician staff at the Clinic in 1999 as an independent contractor.  He possessed no ownership interest in the practice group, nor was he responsible for any oversight of the Clinic’s non-physician staff, there being an administration in place in the group to manage, oversee and train the staff.

3:
Act of May 18, 1995, 74th Leg., R.S., ch. 140, § 1, 1995 Tex. Gen. Laws 985, 986 (repealed 2003).  Because article 4590i continues to govern this case, we will cite the former article rather than the Civil Practice and Remedies Code. 

4:
We note that the Legislature repealed the MLIIA, amended parts of the previous article 4590i, and recodified it in 2003 as chapter 74 of the Texas Civil Practice and Remedies Code. Act of June 2, 2003, 78th Leg., R.S., ch. 204, 2003 Tex. Gen. Laws 847.

5:
“That which looks like a duck, walks like a duck, and quacks like a duck, will be treated as a duck even though some would insist upon calling it a chicken.”  
Tidelands Marine Serv. v. Patterson
, 719 F.2d 126, 128 n.3 (5th
 Cir. 1983).