COURT OF APPEALS

                                                 SECOND
DISTRICT OF TEXAS

                                                                FORT
WORTH

 

 

                                        NO.
2-06-132-CV

 

 

WILLIAM LOWE, M.D.                                                          APPELLANT

 

                                                   V.

 

MARY HERNANDEZ                                                                APPELLEE

 

                                              ------------

 

            FROM THE 96TH
DISTRICT COURT OF TARRANT COUNTY

 

                                              ------------

 

                                MEMORANDUM OPINION[1]

 

                                              ------------

I. 
Introduction

In five issues, Appellant William Lowe, M.D.
asserts that the trial court erred in awarding judgment, following a jury
trial, to Appellee Mary Hernandez for a job termination claim following a
course of surgical and medical treatment provided by Dr. Lowe.  We affirm. 









II. 
Factual and Procedural Background

This is the case of the five-pound mistake.  

A. Hernandez=s
Employment and Her Injury

Hernandez was first employed by Calico Corners (ACalico@) in
1987 as a part-time salesperson.  She was
promoted after a few months to full-time salesperson, and then eventually to
store manager three or four years later. 
In the spring of 2001, Calico employed the fifty-four year old Hernandez
as the manager of its retail fabric store in the Ridgmar Mall area of Fort
Worth.  Whether as a salesperson or the
store manager, one of the functions of her job during her fourteen years with
Calico was to maintain the physical ability to lift, control, and carry heavy
and bulky merchandise weighing up to fifty pounds for a majority of her
scheduled work hours.  As store manager,
she was responsible for enforcing this administrative standard through the
recruitment, hiring, training, review, and annual performance appraisal of each
member of the store staff.  Hernandez was
responsible for managing the store in a manner resulting Ain
retail sales generating the optimum profit on a continuing basis.@  During this time Hernandez would, on occasion,
leave the store to visit a customer=s home
for the purpose of calculating the yardage of fabric required for a particular
decoration project.  On April 17, 2001,
during just such a visit, she fell and broke her left wrist.








B. Dr. Lowe

The doctor who treated Hernandez in the emergency
room referred her to Dr. Lowe, a board-certified orthopedic surgeon
specializing in hand and lower arm procedures. 
Seeing her the next day at The Bone and Joint Clinic (Athe
Clinic@),[2]
Dr. Lowe diagnosed Hernandez as suffering from a displaced distal radius
fracture with comminution.  He
recommended that she undergo an open reduction procedure with internal
fixation.

On April 20, 2001, Dr. Lowe performed successful
surgery to repair the fracture and realign the bone and joint by internal
fixation.  Hernandez had no complaints
about the surgery.  Post-operatively, he
anticipated that the wrist would remain in a cast for three to four weeks.  Not only did the bone require healing, but
all the soft tissues, tendons and ligaments required time and therapy to
recover fully from the injury.  During
Hernandez=s first post-operative office
visit, on April 30, 2001, Dr. Lowe noted proper alignment and healing, with
lessening, if unresolved, pain. 








Because the injury was work-related, Hernandez
was eligible for, and claimed and received, worker=s
compensation benefits.  Sentry Insurance
Company (ASentry@) was
the worker=s compensation carrier for
Calico.  Sentry used Cross Rehabilitation
as its medical consultants.  Throughout
the course of her treatment by Dr. Lowe and other physicians, Hernandez
routinely discussed the status of her medical condition and work situation with
not only Sentry=s adjuster, Fredda Fitzpatrick,
but also with the Cross Rehabilitation consultant assigned to handle Hernandez=s case,
registered nurse Sara Sorhabi, as well as her Human Resources contacts at
Calico, Kimberly McKeown and Renae Long. Sohrabi made some of Hernandez=s doctor
appointments and accompanied her to those appointments, including her follow-up
visits with Dr. Lowe.  Sohrabi worked
closely with Dr. Lowe to help Hernandez make informed choices about her medical
treatment.

C. Work Status Reports 








Hernandez testified that during her recovery she
relied upon Dr. Lowe=s instructions concerning when
she should return to work and what job activities she could perform without
hindering her recovery.  Throughout
Hernandez=s recovery, Dr. Lowe completed
the required Texas Workers=
Compensation Work Status Reports (AWSRs@), which
Dr. Lowe knew required accuracy in their completion.  He testified that at the Clinic, he had the
staff complete the top part of the WSR; he would then add the restrictions,
review, and sign them.  A WSR is a form
report concerning a patient=s
current physical and psychological status, filled out and signed by a treating
physician and sent to the patient=s
employer periodicallyCusually with each office visitCto
advise the employer of the employee=s
medical progress and ability to perform certain physical functions.  However, a WSR is not a final determination
of a patient=s capacity to return to a
particular job.  Dr. Lowe was aware that
these WSRs would go to the patient=s
employer.

Though the WSR represents the treating physician=s
professional assessment of the patient=s
ability to function from a medical standpoint, information from the patient
herself is critical to his determination of whether or with what restrictions,
if any, she may return to work. 
Ultimately, the patient and her employer decide whether she can return,
comparing the physical or psychological requirements of the job with the
restrictions identified by the physician. 
How an employer may use the information contained in a WSR with regard
to a specific patient is not something of which the doctor becomes aware unless
disclosed by the patient or employer.








During her first post-operative office visit, Dr.
Lowe initally filled out the WSR to indicate that Hernandez was not medically
capable of returning to work and that he would reevaluate her on June 1,
2001.  Hearing this evaluation as he
wrote it, Hernandez stopped Dr. Lowe and specifically requested that he let her
return to work despite her left arm restrictions because she was capable of
performing her job under the circumstances. 
Based upon this representation, Dr. Lowe crossed out his previous
statement on the form and wrote that Hernandez could return to work as long as
she did not use her left arm.

At no time did Dr. Lowe suggest to Hernandez that
she could not come to him with questions about her condition, treatment, or
paperwork, and Hernandez regularly communicated with the individuals
responsible for providing her workers=
compensation benefits concerning her medical condition and work situation.

Based upon the first WSR prepared by Dr. Lowe,
Hernandez returned to work restricted from performing any lifting or carrying
with her left wrist. Hernandez returned to work as soon as she could after her
surgery and worked with restrictions throughout her rehabilitative period.  When she returned, she followed Dr. Lowe=s
instructions and attended all of the therapy sessions prescribed by him.  Calico modified Hernandez=s
previous work schedule in accordance with Dr. Lowe=s
temporary work restrictions, and allowed Hernandez to have other employees
assist her in lifting material so that she would not re-injure her wrist.








Over the course of her eight months of recovery,
Hernandez continued to follow Dr. Lowe=s
instructions.  She gradually became able
to perform more job functions with her wrist, and made continual progress
towards attaining the fifty-pound lifting requirements of her job.  Sohrabi also continued to monitor Hernandez=s
progress and attended doctor appointments with her.  At the end of each appointment, Dr. Lowe
would fill out a WSR that informed Calico of Hernandez=s
progress and what restrictions he placed on her work activities.

D. Lifting Restriction 

Only after her July 9, 2001 office visit did Dr.
Lowe Aup@
Hernandez=s lifting restriction from none
to a two-pound weight limit for no more than an eight-hour work day.  He subsequently increased this weight
restriction to five pounds after the August 13, 2001 office visit, but extended
the restriction from her left wrist to her left arm due to evolving complaints
and problems with her left shoulder function. 
These occurred about three to four months into her recovery when
Hernandez began experiencing pain in her shoulder, for which Dr. Lowe referred
her to Joseph Milne, M.D., a board-certified orthopedic surgeon specializing in
procedures of the shoulder, knee, and elbow.








Hernandez saw Dr. Milne on August 23, 2001.  Answering the ASimple
Shoulder Test@ form provided for physical
complaint and medical history purposes, Hernandez confirmed that, although she
could lift eight pounds to the level of her shoulder without bending her elbow,
she could not carry twenty pounds at her side with her left arm nor work full
time at her regular job. Completing the APatient
Self Evaluation@ form provided contemporaneously
with the ASimple Shoulder Test@ form,
Hernandez complained of left shoulder pain, both during the day and at night,
wrote that the Ahardest thing she had to do at
work/home@ was Aheavy
lifting@ and
that Alifting
heavy bolts of fabric@ was the activity that caused
her shoulder to hurt.  Asked to rate her
ability to perform routine tasks with her affected shoulder, she rated only her
ability to comb her hair as Anormal.@  She further conceded Adifficulty@ in
using her hand with her left arm at shoulder level and her ability to eat with
a utensil Aonly with aid.@  Finally, she rated herself Aunable@ to
carry ten to fifteen pounds with her left arm at her side, to use her left hand
overhead, to do any lifting, or to perform her usual work.








In providing an oral history to Dr. Milne,
Hernandez attributed Apersistent shoulder pain@ to her
original injury of April 17, 2001.  She
also complained of left shoulder pain when Alifting@ or
reaching behind her back.  Based upon his
physical examination of Hernandez, Dr. Milne described her as suffering from
both persistent shoulder pain and weakness, and recommended that she undergo an
MRI to rule out any rotator cutoff pathology. 
Since this left shoulder injury was asserted to be work-related, he
prepared a WSR permitting Hernandez to return to work with a weight lifting
restriction of no more than five pounds. 
Dr. Milne did not give Hernandez any work restrictions specifically for
her shoulder.  She pursued her shoulder
rehabilitation treatment conscientiously.

Following the MRI and based upon her MRI results,
Dr. Milne diagnosed Hernandez on September 11, 2001 with a rotator cuff tear of
her left shoulder.  A cuff tear makes it
very difficult to lift the arm overhead. 
After discussing the risks and benefits of conservative management
versus repairing the cuff arthroscopically with Dr. Milne, Hernandez declined
to undergo surgical therapy, opting to focus more on further rehabilitation of
her left hand and wrist.  Though the
record does not reflect that Dr. Milne prepared a WSR for this office visit,
Dr. Lowe prepared one after seeing Hernandez on September 17, 2001 that
specifically addressed her left shoulder injury and continued in effect the
five-pound weight lifting restriction for her left arm.








Dr. Milne last saw Hernandez on October 23,
2001.  Though she reported her shoulder
was doing well overall and professed her ability to do most activities as
desired, upon physical examination, Dr. Milne noted she still experienced Asome
weakness to elevation@ though with minimal pain.  He again discussed with her the risks and
benefits of conservative management versus operative treatment, and she again
declined surgery.  He finally specified
no work restrictions for her shoulder, though he acknowledged that her Aoverall@ work
restrictions were dependent upon Dr. Lowe=s next
evaluation of her hand and wrist. 
Although the Work Status Information section of the WSR form provided
space for Dr. Milne to state that Hernandez could return to work on a certain
date without any restrictions, the record does not reflect that Dr. Milne ever
prepared a final WSR releasing her.








After his last office visit with Hernandez on
November 19, 2001, Dr. Lowe addressed both her left wrist and her left shoulder
injury in his preparation of the WSR, specifically referring to both the Afracture@ and the
Arotator
cuff@ in the
General Information Section of the form. 
During the visit, Hernandez proclaimed herself happy with the recovery
of her wrist; though she confessed to occasional aches and pains, she told Dr.
Lowe that they were improving and she was able to do her job under the
circumstances.  Since she had elected not
to undergo corrective shoulder surgery for her torn rotator cuff, Dr. Lowe
concluded that she needed to be evaluated at Maximum Medical Improvement (AMMI@) and
thereby establish the date after which she no longer needed medical care for
her work-related injuries.  An evaluation
at MMI requires (1) a Functional Capacity Examination (AFCE@) to
determine the functional capacity of the patient for her return to work and (2)
a formal finding of the patient=s
impairment rating which determines the employee=s
compensation for her work-related injury.

Dr. Lowe told Hernandez and Sohrabi, and made a
chart note for Hernandez=s November 19, 2001 exam, that
upon receiving the FCE results, he would update Hernandez=s work
restrictions and place any permanent restrictions on her work activities.

E. Hernandez=s
Permanent Work Restrictions 

With respect to Hernandez=s
permanent work restrictions, Dr. Lowe testified that his plan was as stated in
the November 19, 2001 chart note: Aonce
[the FCE] is done and we see a report, we can give [Hernandez] some permanent
work restrictions.@








To determine her actual, permanent work
restrictions at MMI, Dr. Lowe referred Hernandez to Cooper & Bush Physical
Therapy for her FCE.  In attendance
during this office visit, Sorhabi scheduled the FCE for November 27, 2001.  Pending completion of the FCE, Dr. Lowe
prepared a WSR that retained the five-pound weight restriction previously
imposed on Hernandez for lifting and added an additional motion restriction
completely prohibiting Aoverhead reaching.@  Despite intending these restrictions to be
subject to final revision pending the FCE, and being understood by Sorhabi in
this manner, Dr. Lowe described these restrictions as Apermanent@ on the
November 19, 2001 WSR. As always, Calico received the WSR.  As part of the Clinic=s normal
routine in processing workers= compensation
paperwork, Dr. Lowes office note of November 19, 2001 was sent to Sentry. 

Dr. Lowe testified at trial that it was a mistake
to write Apermanent@ on
Hernandez=s workers=
compensation WSR before he reviewed her FCE report.  He also testified that he failed to review
the FCE report or update Hernandez>s work
restrictions at any time before August 2002, although the assessment had been
in her chart for some eight months.  He
further stated that he did not review Hernandez=s chart
properly before he filled out Hernandez=s
long-term disability report for Reliance Insurance.  The effect of all this was that he reported
that Hernandez had a permanent five-pound lifting restriction.

Because she needed an impairment rating that took
into consideration both her wrist and shoulder injuries, and Dr. Lowe limited
his practice to impairment ratings for hand injuries, he referred Hernandez to
another orthopedic surgeon at the Clinic, Joseph H. Gaines, M.D., whose
practice included impairment ratings for both hand and shoulder injuries.  The impairment rating determined the
percentage of permanent impairment to the whole body.








Though physically given the WSR when she left the
Clinic, Hernandez did not question Dr. Lowe about his designation of her work
restrictions as Apermanent.@  Hernandez never told Dr. Lowe that the weight
restrictions under which she had been working since May failed to meet the
lifting requirements for her job and put her at risk for termination.  Hernandez faxed the November 19, 2001 WSR, as
well as notification of the two additional evaluations she was to undergo, to
Renae Long, one of Hernandez=s Human
Resources contacts at Calico.








As scheduled, Hernandez underwent the FCE on
November 27, 2001 and the MMI impairment rating on November 28, 2001.  Hernandez went to the Cooper & Bush
Physical Therapy Clinic in Fort Worth for her FCECthe test
Dr. Lowe needed to make his final assessment and formulate her permanent work
restrictions.  Contrary to her
representations during her last visit with Dr. Lowe, Hernandez gave a medical
history to the physical therapist that included continuing intermittent pain in
the left wrist and occasional shoulder pain, an inability to close her fingers,
weakness in her grip and Adecreased@ lifting
ability.  She also described the Amaterial
handling requirements@ of her job as lifting thirty to
fifty pounds from floor to knuckle, knuckle to shoulder and shoulder to
overhead, as well as carrying the same weight fifty feet, all five to ten times
per day.  The examination concluded that
she could partially lift up to fifty pounds at work.  Specifically, the FCE demonstrated that,
although she could lift fifty pounds from floor to knuckle, Hernandez could
only lift eighteen pounds for fifty feet. 
It also documented her inability to lift more than ten and forty pounds
overhead with her left and right arms, singly and respectively.  Finally, the FCE attributed to Hernandez a
statement that these weights would be sufficient for most of the lifting
required by her employment, and that she was able to recruit help from her
staff when the bolts of fabric were too heavy. 
Though she did not recall making this statement at trial, Hernandez confirmed
that it accurately described exactly what had been occurring during the
entirety of her recovery in 2001.

Cooper & Bush sent this report to Dr. Lowe
approximately one week later, and Dr. Lowe signed the report.  Although Dr. Lowe was supposed to use this
report to update Hernandez=s
lifting restrictions and establish her permanent work restrictions, he did
not.  From Calico>s
standpoint, this left Hernandez with the November 19, 2001 WSR stating that she
had a permanent five-pound maximum work restriction.  Dr. Lowe was sent a copy of the FCE;
Hernandez was not sent a copy.  Hernandez
did not receive the results of the FCE showing that she could lift up to fifty
pounds from floor to knuckle until the late summer of 2002.  The results of the FCE also documented that
Hernandez could not meet the lifting requirements for some lifts over seven
months after the underlying accident without substantial assistance from her
staff.








After seeing her and preparing his impairment
rating on November 28, 2001, Dr. Gaines certified, by a Report of Medical
Evaluation dated December 5, 2001, that Hernandez had reached MMI on the earlier
date.  Employing the fourth edition of
the Guides to the Evaluation of Permanent Impairment published by the
American Medical Association (AMA), he further posited a whole body impairment
rating for Hernandez of twelve percent, consisting of a total left hand
impairment rating of ten percent and a total left shoulder impairment rating of
two percent. 

Dr. Lowe signed both the FCE and the MMI
impairment rating prepared by Dr. Gaines. 
He had intended to amend the November 19, 2001 WSR in accordance with
these results when he received them, but did not do so due to an oversight. He
claimed the process maintained by the Clinic somehow did not get instituted as
usual so he did not receive all the relevant paperwork with the FCE. 

F. Hernandez=s
Termination   








In mid-December 2001 Hernandez=s
supervisor, Ginny Lewis, informed her that Calico intended to terminate her
employment effective December 31, 2001, due to the classification of her work
restrictions as Apermanent@ by Dr.
Lowe on the November 19, 2001 WSR and her resulting inability to lift and
control fifty pounds as required by her job description.  Characterizing her firing as a Avoluntary@
termination, her Employee Separation Report stated the following explanation of
its grounds: AUnable to perform Essential
Functions of the job as outlined in Store Manager Job Description.  Permanent Lifting restrictions assigned in
November 2001 - No Lifting over 5lbs.@

Despite having just obtained the more favorable,
if still substandard results of her FCE, Hernandez did not inform Lewis of this
assessment or attempt to obtain a copy to provide to Calico to rebut the
grounds for her termination.  Nor did she
immediately contact either the Sentry adjuster, Fitzpatrick, or her claim
manager, Sorhabi, to enlist their help in obtaining an amended WSR, though she
specifically Athought about@
enlisting the assistance of these individuals. 
Hernandez never contacted Dr. Lowe in any manner, or sought assistance
from any Clinic employee, before her last day of work on December 31,
2001.  Hernandez decided not to contact
Dr. Lowe because she felt that he would not have helped her by amending the
report.  Similarly, no individual from
Calico contacted or attempted to contact Dr. Lowe before her last day of work.

Nevertheless, Sohrabi left several messages with
Dr. Lowe=s office
attempting to learn the results of the FCE, but Dr. Lowe never returned any of
her calls.








Hernandez professed that she had no idea that
Calico considered her work accommodations throughout 2001 as only Atemporary.@  She further never conveyed any such concern
to Dr. Lowe during her course of treatment.

Stunned by her termination, Hernandez tried to
convince her supervisor, Lewis, that she could in fact lift up to fifty
pounds.  Because she could get no help at
the local level, Hernandez contacted McKeown, the Human Resources Manager for
Calico=s parent
company, Everfast, Inc.  She also
requested, as an alternative, to be given any position at Calico even if she
could not be a manager.  Calico told her
that all positions required the ability to lift up to fifty pounds.  She continued to plead with Calico that she
could lift fifty pounds and requested that Calico revisit its decision to
terminate her.  To honor Hernandez=s
request, McKeown wrote a letter dated January 29, 2002 to Dr. Lowe stating:

Our office is in receipt
of a note from your office, copy attached, dated November 19, 2001 indicating
that Ms. Hernandez could return to work with restrictions.  You indicated on the Texas Workers= Compensation Status
Report that her restrictions were permanent and included no overhead reaching
and lifting/carrying greater than 5 lbs for more than 8 hours per day.

 

Can you please confirm
that these restrictions are indeed permanent and do limit her lifting to no
more than 5 lbs?  Ms. Hernandez has
advised us that these are incorrect and we have made employment decisions based
on these facts.

 








Your prompt response is
greatly appreciated and if you have questions, please give me a call.

 

Dr. Lowe did not respond to McKeown=s
letter.  McKeown made additional
follow-up phone calls, but Dr. Lowe did not take or return these calls.

McKeown did not inform Dr. Lowe that Calico had
fired Hernandez.  The January 29 letter
specifically referred to Hernandez as Aour
employee.@ 
Dr. Lowe stated that he never saw this letter, nor did be become aware
of its existence, or of the firing of Hernandez, until after he received the
notice letter concerning the health care liability claim she intended to and
eventually filed against him in 2003.  On
February 6, 2002, McKeown reported that she finally spoke with Dawn Stanberry,
the Clinic employee responsible for workers=
compensation paperwork.  Stanberry stated
that Dr. Lowe told her that the restrictions were indeed permanent.  Based upon this information, Hernandez was
not eligible to be rehired because she did not meet the requirement of being
able to lift up to fifty pounds, so McKeown advised Hernandez to apply for
long-term disability with Reliance Standard Life Insurance (AReliance
Insurance@).  Hernandez took the advice and sent her
application to Reliance Insurance.








Additional testimony from Dr. Lowe revealed that
he did not return telephone calls from Sohrabi or McKeown.  Dr. Lowe admitted that he remembered telling
Stanberry that Hernandez=s restrictions were permanent
when McKeown called him in January 2002 to clarify the November 19, 2001
WSR.  Dr. Lowe testified that the error
concerning the WSR would not have occurred had he simply taken a few minutes to
review his patient=s chart.  He also admitted that he never corrected the
WSR or the long-term disability insurance form. 
As of the date of trial, Hernandez was still working under the erroneous
WSR that states she is permanently restricted from lifting over five pounds at
work.

After receiving Hernandez=s
application for long-term disability, Relaince Insurance wrote Dr. Lowe.  Reliance Insurance requested Hernandez=s
medical records and that Dr. Lowe fill out its medical questionnaire.  On February 28, 2002, Dr. Lowe again wrote
that Hernandez could only lift five pounds and that the restriction was
permanent, but he did not review the FCE in her chart that clearly stated
Hernandez=s ability to lift fifty pounds.

G. Hernandez=s
Financial Hardship








To pay her bills, Hernandez was able to find work
at Gabberts, a retail furniture store, as a salesperson.  Her compensation with Gabberts was much less
than her salary at Calico.  When
Hernandez=s compensation at Gabberts went
to commission only, Hernandez knew that her income would decrease dramatically,
and she was forced to find a new job. 
Herenandez went to work for Ashley Furniture as a salesperson.  Initally, her wages were much less than they
had been with Calico.  To make ends meet,
Hernandez cashed in her retirement and savings accounts to pay for her basic
living expenses and used loans and credit cards to buy food and pay her
mortgage.

Because of financial worries, Hernandez developed
physical symptoms directly related to stress. 
She could not sleep; she had frequent headaches and backaches.  The stress of her job loss and financial
problems also aggravated her diabetes.

In the summer of 2002, Hernandez was still
waiting on her long-term disability claim to be approved.  On July 29, 2002, Reliance Insurance sent
Hernandez a rejection letter.  The letter
states in pertinent part:

[W]e would like to point
out that the functional capacities examination conducted on November 27, 2001,
revealed a functional lifting level of 50 pounds, which you yourself documented
as being sufficient in meeting the demands of your job.  As a result, it is apparent that while you
were not considered Totally Disabled from performing the material duties of
your occupation, you were also capable of performing your particular job at the
exertion level you suggested.

 

After her workers=
compensation benefits expired and her former employer=s long
term disability insurer denied her claim for benefits in August 2002, Hernandez
sought a clarification of her work restrictions directly from Dr. Lowe.








Apparently, for the first time, Dr. Lowe reviewed
the FCE and noted in her chart that Hernandez could lift fifty pounds.  He also noted that the November 19, 2001
workers=
compensation WSR, which he had written, reviewed, and signed, showed a
five-pound lifting restriction instead of fifty pounds.  He attempted to explain the error with the
explanation in a chart note sent to Hernandez that the staff made an error in
leaving off the zero on the end of the five-pound restriction.

Hernandez contacted Calico to see if she could
have her old manager=s job back but was informed she
was too late; Calico had already hired someone to take her place. 

H. Procedural History 








On May 13, 2003, Hernandez sued Dr. Lowe for the
termination of her employment by Calico, specifically alleging that Dr. Lowe
proximately caused her firing by negligently misreporting her functional
capacity to Calico and failing to correct this error when requested.  Asserting negligence, respondeat superior,
defamation and gross negligence theories of liability, she sought actual
damages for lost earnings in the past and future, and emotional distress and
exemplary damages.  Hernandez sent Dr.
Lowe a notice letter in January 2003 and filed both a cost bond and a
preliminary expert report pursuant to former Texas Revised Civil Statute
Article 4590i section 13.01[3],
the latter alleging medical negligence against Dr. Lowe and asserting a causal
connection between such negligence and the wrongful termination of her
employment.  Dr. Lowe generally denied
each and every allegation.

Before the case went to trial, Hernandez
abandoned the defamation and gross negligence claims, and later her respondeat
superior claims based upon the alleged negligence of Clinic employees.

The case went to trial before a jury on February
2, 2006.  At the conclusion of the trial
on the merits, the jury returned a verdict in favor of Hernandez, finding Dr.
Lowe one hundred percent negligent and declining to find any contributing
negligence on the part of Hernandez.  The
jury awarded damages in the amount of $179,589; $28,589 for lost wages and $150,000
for past mental anguish.  Hernandez moved
for and the trial court granted a final judgment on the verdict.  Due to an error in the calculation of
prejudgment interest, Hernandez filed a motion for judgment nunc pro tunc,
which was granted by the entry of a corrected judgment.








Dr. Lowe subsequently filed a motion for judgment
notwithstanding the verdict asserting that Hernandez failed to present any
expert testimony regarding cause in fact and reasonable foreseeability and
failed to present any legally or factually sufficient evidence on cause in fact
or reasonable foreseeability from any source. 
The trial court overruled the motion.

Dr. Lowe then filed a motion to modify the
judgment, or alternatively, motion for new trial.  The court overruled this motion as well.  Dr. Lowe then perfected this appeal.

III.  Legal
and Factual Sufficiency

In his first issue, Dr. Lowe argues that the
evidence of the Acausal relationship between the
five pound lifting restriction imposed by Dr. Lowe and the termination of her
employment, given her incontrovertible inability to meet the fifty pound
lifting requirement for her position,@ was
both legally and factually insufficient.

A. 
Standards of Review








A legal sufficiency challenge may only be sustained
when:  (1) the record discloses a
complete absence of evidence of a vital fact; (2) the court is barred by rules
of law or of evidence from giving weight to the only evidence offered to prove
a vital fact; (3) the evidence offered to prove a vital fact is no more than a
mere scintilla; or (4) the evidence establishes conclusively the opposite of a
vital fact.  Uniroyal Goodrich Tire
Co. v. Martinez, 977 S.W.2d 328, 334 (Tex. 1998), cert. denied, 526
U.S. 1040 (1999); Robert W. Calvert, ANo
Evidence@ and AInsufficient
Evidence@ Points of Error, 38 TEX. L. REV. 361,
362B63
(1960).  In determining whether there is legally
sufficient evidence to support the finding under review, we must consider
evidence favorable to the finding if a reasonable factfinder could, and
disregard evidence contrary to the finding unless a reasonable factfinder could
not.  City of Keller v. Wilson, 168
S.W.3d 802, 827 (Tex. 2005). 

An assertion that the evidence is factually
insufficient to support a fact finding means that the evidence supporting the
finding is so weak or the evidence to the contrary is so overwhelming that the
answer should be set aside and a new trial ordered.  Garza v. Alviar, 395 S.W.2d 821, 823
(Tex. 1965).  We are required to consider
all of the evidence in the case in making this determination, not just the
evidence that supports the finding.  Mar.
Overseas Corp. v. Ellis, 971 S.W.2d 402, 406B07
(Tex.), cert. denied, 525 U.S. 1017 (1998).

B. Application

Dr. Lowe initially asserts that expert testimony
was required to establish the causal relationship between the erroneous
documentation and any damage allegedly caused thereby.  We first observe that 








A cause of action against a health care provider is a health care
liability claim under the MLIIA[4]
[Medical Liability Insurance Improvement Act], if it is based on a claimed
departure from an accepted standard of medical care, health care, or safety of
the patient, whether the action sounds in tort or contract.  A cause of action alleges a departure from accepted
standards of medical care or health care if the act or omission complained of
is an inseparable part of the rendition of medical services.

 

Emeritus Corp. v. Highsmith, 211 S.W.3d 321, 327 (Tex. App.CSan
Antonio 2006, pet. denied) (citing Diversicare Gen. Partner, Inc. v. Rubio,
185 S.W.3d 842, 848 (Tex. 2005)).  








Dr. Lowe asserts that the assessment of a patient=s
ability to return to work and function, the preparation of the documents
required for that assessment and, as phrased by Dr. Lowe, Awhat
happens to a patient as a result of that medical assessment and submission of
documentation are matters outside the common knowledge of the lay public that
require expert medical testimony.@  For these assertions Dr. Lowe cites Hart
v. Van Zandt, 399 S.W.2d 791, 792 (Tex. 1965) (stating that when Adetermining
negligence in a case . . . which concerns the highly specialized art of
treating disease, the court and jury must be dependent on expert testimony@); Bowles
v. Bourdon, 148 Tex. 1, 5, 219 S.W.2d 779, 782 (1949) (stating the same);
and Connor v. Waltrip, 791 S.W.2d 537, 539 (Tex. App.CDallas
1990, no writ) (stating that a summary judgment may be based on the
uncontroverted testimonial evidence of an interested expert witness concerning
the subject matter on which the trier of fact must be guided solely by expert
testimony). 








Hernandez responds that her negligence claim
against Dr. Lowe involves non-medical, administrative or ministerial acts from
a physician and does not require expert testimony because the jury is competent
from its own experience to determine and apply a reasonable standard of care,
citing St. Paul Med. Ctr. v. Cecil, 842 S.W.2d 808, 812 (Tex. App.CDallas
1992, no writ) (stating that the standard of non-medical, administrative,
ministerial, or routine care at a hospital need not be established by expert
testimony because the jury is competent from its own experience to determine
and apply such a reasonable‑care standard); Golden Villa Nursing Home,
Inc. v. Smith, 674 S.W.2d 343, 349 (Tex. App.CHouston
[14th Dist.] 1984, writ ref=d
n.r.e.) (stating same).  Hernandez
asserts that under the facts of this case, lay testimony is adequate to prove
causation because the jury=s
general experience and common sense will enable them to determine with
reasonable probability the causal relationship between the erroneous
documentation and her termination, citing Morgan v. Compugraphic Corp.,
675 S.W.2d 729, 733 (Tex. 1984) (stating the principle that lay testimony is
adequate to prove causation in those cases in which general experience and
common sense will enable a layman to determine, with reasonable probability,
the causal relationship between the event and the condition).  We agree.   


Hernandez points us to the following evidence, in
part: 

Dr. Lowe reviewed the
WSRs that he and his staff completed and then signed them.

 

The WSRs informed Calico
of Hernandez=s temporary work
restrictions, which dictated what she could temporarily do on the job.

 

On November 19, 2001, Hernandez had her final
appointment with Dr. Lowe and he signed a WSR that stated Hernandez could only
lift five pounds.  The report said that
the restriction was permanent. 

 

Dr. Lowe then instructed
Hernandez to have a FCE peformed so he could determine what permanent
restrictions would be required. 

 

Dr. Lowe made a chart
entry after the November 19, 2001 appointment that stated he would need to
review the FCE once it was completed. 
After reviewing the results, he would then assign permanent work
restrictions for Hernandez.

 

Dr. Lowe received and
signed the FCE around the first week of December 2001.

 

Dr. Lowe did not review
Hernandez=s chart or the FCE until
August 2002, approximately eight months after Hernandez had the examination.

 








Hernandez=s Employee Separation
Report stated the reason for her separation from Calico was that she was Aunable to perform
essential functions of the job as outlined in the store manager job
description.  Permanent lifting
restrictions assigned on November 2001--No lifting over 5lbs. [Emphasis
added.]

 

Sohrabi=s calls to Dr. Lowe=s office concerning the
results of the FCE went unanswered.

 

In mid-January 2002,
McKeown wrote a letter to Dr. Lowe asking if the five pound lifting restriction
was permanent because Calico had based employment decisions on that lifting
restriction. McKeown received no response to her letter.

 

McKeown spoke to
Stanberry, an employee of the Clinic. 
Stanberry asked Dr. Lowe if the restrictions were permanent because
Hernandez=s employer wanted to
know.  Without reviewing the chart, Dr.
Lowe told Stanberry Ayes.@  Stanberry then passed this information on to
McKeown.

 

In July 2002, Hernandez
received a letter denying her long-term disability benefits.  Hernandez learned that her long-term
disability was denied because her FCE showed that she could lift fifty pounds.

 

Hernandez went to Dr.
Lowe=s office and he reviewed
her chart and discovered the mistake.  In
a chart note sent to Hernandez, Dr. Lowe surmised that the office staff must
have left off a zero on the original report so the report stated A5@ instead of A50@ pounds for the permanent
work restriction.

 

At trial, Lowe admitted
that the permanent five pound restriction stated in the November 19, 2001 WSR
was his mistake.

 

Dr. Lowe testified that
his failure to review Hernandez=s chart when her employer called and when the
insurance company sent him the form for long-term disability were also his
mistakes. 

 








Dr. Lowe also testified
that he could have corrected these clerical mistakes once he became aware of
them, but simply failed to do so. 
However, he never corrected her permanent restriction.  At the time of trial Hernandez was still
working under the inaccurate November 19, 2001 WSR and was thus obligated to
inform any employer of that permanent work restriction.

 

We cannot agree with Dr. Lowe=s
assertion that a physician=s
failure to properly document a patient=s status
which subsequently caused her to be fired from her job must be proved by expert
testimony.  This conclusion is further
supported by the fact that the wording on the very document explaining
Hernandez=s termination stated that her
termination was due to the permanent five-pound lifting restriction.

Dr. Lowe next urges that Aan
employee cannot recover for her wrongful termination or retaliatory discharge
if she sustains a work-related injury that prevents her from performing the
essential functions of that position.@  Dr. Lowe attempts to analogize this
negligence case to a wrongful termination case under the Texas Labor Code and
asserts that Hernandez cannot recover if her employer had a legitimate reason
to terminate her employment apart from the permanent five-pound lifting
restriction.  This is not a wrongful
termination case.  It is a negligence
case, and we likewise reject Dr. Lowe=s
attempt to alter the character of Hernandez=s cause
of action.  A duck is a duck, not a
chicken.[5]









Dr. Lowe continues his argument, in essence, that
Hernandez would have been fired anyway because her work-related injuries
prevented her from performing the essential functions of her position.  Because this is a negligence case and not a
wrongful termination case, an examination of the evidence, previously set forth
in detail, clearly demonstrates that the evidence was sufficient, both legally
and factually, for the jury to believe that Hernandez was fired because of the
erroneous permanent five-pound lifting restriction.  We overrule Dr. Lowe=s first
issue.  

IV. 
Contributory Negligence

In his second issue, Dr. Lowe argues that he
presented conclusive evidence of Hernandez=s
contributory negligence and the jury=s
failure to find such negligence is against the great weight and preponderance
of the evidence.

A. 
Standard of Review

In reviewing an issue asserting that a finding is Aagainst the great
weight and preponderance@ of the evidence, we must consider and
weigh all of the evidence and set aside the finding only if the evidence is so
weak or the finding is so contrary to the great weight and preponderance of the
evidence as to be clearly wrong and unjust. 
Dow Chem. Co. v. Francis, 46 S.W.3d 237, 242 (Tex. 2001); In
re King's Estate, 150 Tex. 662, 244 S.W.2d 660, 661 (1951).

 








B. Application

The evidence, as detailed above, supports the
jury=s
finding that Hernandez was not negligent. 
For example, the evidence showed that Hernandez relied upon Dr. Lowe to
assess and accurately report her medical condition to Calico.  Hernandez also presented evidence of the
steps she took to identify Dr. Lowe=s
mistakes and to get them rectified from the time she was told she was being
fired until months after she was terminated. 
After considering and weighing all of the evidence, we cannot say that
the evidence supporting the finding that Hernandez was not negligent is so
contrary to the great weight and preponderance of the evidence that it is clearly
wrong and unjust.  Francis, 46
S.W.3d at 242; King's Estate, 244 S.W.2d at 661.  We overrule Dr. Lowe=s second
issue.

V.  Alleged
Charge Errors

In his third, fourth, and fifth issues, Dr. Lowe
asserts three separate errors in the charge of the court.  

A. 
Standard of Review








Determining whether an instruction or definition
is erroneous is based on an abuse of discretion standard, that is where the
trial court acts arbitrarily or without reference to any guiding
principle.  Tex. Dep=t Human
Servs. v. E.B., 802 S.W.2d 647, 649 (Tex. 1990).  To determine whether alleged charge error
requires remand, the court must consider the pleadings, the evidence presented
at trial, and the charge in its entirety. 
Island Recreational Dev. Corp. v. Republic of Tex. Sav. Ass=n, 710
S.W.2d 551, 555 (Tex. 1986).  Charge
error is reversible if it caused, or was reasonably calculated to cause, the
rendition of an improper judgment.  Id.

B. 
Reasonable Person Standard

Dr. Lowe first urges this court to find error in
the charge of the court because the reasonable person standard was applied to
Dr. Lowe as opposed to the standard utilized when a physician is charged with
medical negligence. 

We have already determined that the actions of
Dr. Lowe giving rise to the negligence claim were ministerial or administrative
in nature, not requiring expert testimony because the acts were not of
professional negligence, and hence the reasonable person standard was
appropriate.  Dr. Lowe=s third
issue is overruled.

C. 
Employees= Acts

Dr. Lowe next argues that the jury attributed the
acts and omissions of the Clinic>s
employees to Dr. Lowe, which was improper because he was without contractual or
supervisory authority to direct the details of their conduct.













In the charge, the court gave the following
definition: AAn >employee= is a
person in the service of another with the understanding, express or implied,
that such other person has the right to direct the details of the work and not
merely the result accomplished.@  However, no questions were asked of the jury,
nor instructions given, involving this definition.  Further, Hernandez=s second
amended original petition did not contain any vicarious liability allegations,
and the evidence at trial showed that Dr. Lowe was an independent contractor
and that the Clinic staff were not his employees.  While there was testimony at trial concerning
the activities of the clinic staff in connection with the WSRs, the absence of
questions or instructions regarding an Aemployee@ leads
us to hold that the inclusion of the definition was unnecessary and error.  However,
to obtain reversal of a judgment based upon an error in the trial court, the
appellant must show that (1) the error occurred; and (2) it probably caused
rendition of an improper judgment, or probably prevented the appellant from properly
presenting the case to this court.  TEX. R. APP. P.
44.1(a); Romero v. KPH Consolidation, Inc., 166 S.W.3d 212, 225B26 (Tex.
2005).   Here, extensive evidence
previously recounted in this opinion supports the jury=s
verdict, and we cannot say that an improper judgment occurred, or that Dr. Lowe
was prevented from presenting his case, by the inclusion of this extraneous
definition.  Thus, the error was
harmless.  Dr. Lowe>s fourth
issue is overruled.

D.  Sole
Proximate Cause

Lastly, Dr. Lowe asserts error in the charge
through the trial court=s failure to include his
requested definition of sole proximate cause.

According to Pattern Jury Charge 3.2, General
Negligence, Asole proximate cause@ is
defined as follows: AThere may be more than one
proximate cause of an event, but if an act or omission of any person not a
party to the suit was the >sole
proximate cause= of an occurrence, then no act
or omission of any other person could have been a proximate cause.  2 Comm.
on Pattern Jury Charges, State Bar of Tex., Texas Pattern Jury Charges PJC
3.2 (2006).  ASole
proximate cause@ is an inferential rebuttal and
should be submitted to the jury if there is evidence that a person=s
conduct that is not submitted to the jury is the sole proximate cause of the
occurrence.  See Am. Jet, Inc. v.
Leyendecker, 683 S.W.2d 121, 126 (Tex. App.CSan
Antonio 1984, no writ); Herrera v. Balmorhea Feeders, Inc., 539 S.W.2d
84, 86 (Tex. Civ. App.CEl Paso 1976, writ ref=d
n.r.e.).  Submission of the inferential
rebuttal is improper and may be reversible error if there is no such
evidence.  See Huerta v. Hotel Dieu
Hosp., 636 S.W.2d 208, 209B10 (Tex.
App.CEl
Paso), rev=d on other grounds, 639
S.W.2d 463 (Tex. 1982).  








Dr. Lowe argues that he submitted evidence that
both Calico and the Clinic staff were sole proximate causes of Hernandez=s
termination.  This, of course, is not
possible because there cannot be two sole proximate causes.  Nevertheless, and construing the arguments in
the alternative, the record is also replete with evidence of Dr. Lowe=s
negligence and causation, as previously set forth in this opinion, including
the Calico report citing the permanent five-pound lifting restriction as the
reason for Hernandez=s termination.  Therefore, returning to the definition of
sole proximate cause, Dr. Lowe=s
negligence and causation negate the inferential rebuttal=s
requirement that Ano act or omission of any other
person could have been a proximate cause.@  We overrule Dr. Lowe=s final
issue.

VI. 
Conclusion

Having overruled all of Dr. Lowe=s
issues, we affirm the trial court>s
judgment.

 

 

BOB
MCCOY

JUSTICE

 

PANEL B:   DAUPHINOT,
WALKER, and MCCOY, JJ.

 

WALKER, J. concurs
without opinion.

 

DELIVERED: June 7, 2007











[1]See Tex. R. App. P. 47.4.





[2]Dr. Lowe joined the
physician staff at the Clinic in 1999 as an independent contractor.  He possessed no ownership interest in the
practice group, nor was he responsible for any oversight of the Clinic=s non-physician staff,
there being an administration in place in the group to manage, oversee and
train the staff.





[3]Act of May 18, 1995, 74th
Leg., R.S., ch. 140, ' 1, 1995 Tex. Gen. Laws
985, 986 (repealed 2003).  Because
article 4590i continues to govern this case, we will cite the former article
rather than the Civil Practice and Remedies Code. 





[4]We note that the
Legislature repealed the MLIIA, amended parts of the previous article 4590i,
and recodified it in 2003 as chapter 74 of the Texas Civil Practice and
Remedies Code. Act of June 2, 2003, 78th Leg., R.S., ch. 204, 2003 Tex. Gen.
Laws 847.





[5]AThat which looks like a
duck, walks like a duck, and quacks like a duck, will be treated as a duck even
though some would insist upon calling it a chicken.@  Tidelands Marine Serv. v. Patterson,
719 F.2d 126, 128 n.3 (5th Cir. 1983).