EMERITUS CORPORATION & HB–ESC V LP d/b/a Kingsley Place at Oakwell Farms, Appellants,

v.

Penny HIGHSMITH, as Next Friend of Retha Griffin, Appellee.

No. 04–05–00551–CV.

Court of Appeals of Texas, San Antonio.

May 31, 2006.

Rehearing Overruled Sept. 21, 2006.

---

Laurie A. Weiss, Rosemarie Kanusky, W. Wendell Hall, William T. Sullivan, Fulbright & Jaworski L.L.P., San Antonio, for appellants.

Janice Maloney, Law Office of Pat Maloney, P.C., Thomas G. Kemmy, Law Office of Thomas G. Kemmy, San Antonio, for appellee.

Sitting: SARAH B. DUNCAN, Justice, KAREN ANGELINI, Justice, PHYLIS SPEEDLIN, Justice.

## OPINION

Opinion by SARAH B. DUNCAN, Justice.

Emeritus Corporation and HB–ESC V LP d/b/a Kingsley Place at Oakwell Farms appeal the trial court's order denying their motion to dismiss the claims filed by Penny Highsmith because she failed to timely file an expert report. We hold an order denying a motion to dismiss in this context is subject to interlocutory appeal even though the order also grants an extension of time to serve an expert report *unless* the extension is granted to cure a deficiency in an existing report; all of Highsmith's claims are health care liability claims; and an agreement to abate a health care liability claim to permit the plaintiff to comply with the sixty-day notice requirement does not automatically extend the statutory deadline to serve the required expert report. We therefore reverse the trial court's order and render a take-nothing judgment.

FACTUAL AND PROCEDURAL BACKGROUND

Retha Griffin suffered from dementia and progressive Alzheimer's disease and had a combative history. In 1998 she became a resident at the assisted living facility at Kingsley Place at Oakwell Farms. Numerous resident-on-resident altercations involving Griffin followed. Ultimately, in July 2004, Griffin's lease was cancelled. The following March Griffin's daughter Penny Highsmith filed this lawsuit as her mother's next friend against Kingsley Place and its owner Emeritus Corporation, which we will refer to collectively as "Emeritus." Highsmith asserts claims for negligence, gross negligence and malice, premises liability, breach of contract, fraud, and breach of the Patient's Bill of Rights.

Shortly after filing suit, on March 31, 2005, Highsmith sent Emeritus the statutorily-required notice of filing a health care liability claim. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 74.051(a) (Vernon 2005) (requiring "[a]ny person ... asserting a health care liability claim [to] give written notice of such claim ... to each physician or health care provider against whom such claim is being made at least 60 days before the filing of a suit...."). Emeritus answered and, because it had not received the sixty-day pre-suit notice mandated by statute, moved to abate. *See Schepps v. Presbyterian Hosp. of Dallas,* 652 S.W.2d 934, 938 (Tex.1983) (applying former version of statute and holding that remedy for plaintiff's failure to give the required pre-

suit notice is for trial court, on defendant's motion, to abate cause of action for sixty days). The trial court subsequently signed an order abating the "case ... until 60 days from the date [Emeritus] receive[s] notice of a health care claim under Section 74.051 of the Civil Practice and Remedies Code and the authorization required in Section 74.052 of the Civil Practice and Remedies Code." After Highsmith sent a second notice along with the required authorization on April 25, 2005, the parties agreed the abatement period would end June 27, 2005.

The 120th day after Highsmith filed her petition against Emeritus was July 5, 2005.[1] *See* TEX. CIV. PRAC. & REM.CODE ANN. § 74.351(a) (Vernon Supp.2005) (requiring plaintiff to serve expert report "not later than 120th day after the date the original petition was filed").[2] On July 15, 2005 Emeritus moved to dismiss Highsmith's lawsuit with prejudice pursuant to section 74.351(b) of the Texas Civil Practice and Remedies Code because, it argued, Highsmith's claims, however denominated, are actually health care liability claims; more than 120 days had elapsed since the claims were filed; and Highsmith had not served it with an expert report. *See id.* § 74.351(b). In her response, Highsmith argued the motion should be denied because her suit alleged common law negligence and premises liability claims, not health care liability claims; to the extent her suit asserted health care liability claims, "the expert witness deadline ... has not expired because the case was abat-

---

1. The 120th day was actually Saturday, July 2; and the following Monday was July 4th, a legal holiday.

2. Before September 1, 2005, section 74.351(a) required the expert report be filed "not later than the 120th day after the date the claim was filed." Act of June 2, 2003, 78th Leg., R.S., ch. 204, § 10.01, 2003 Tex. Laws 847, 875 (amended 2005) (current version at

TEX. CIV. PRAC. & REM.CODE ANN. § 74.351(a) (Vernon Supp.2005)). Because Highsmith's cause of action accrued before the effective date of the amendment, the previous version of section 74.351(a) applies to her claims. Act of May 18, 2005, 79th Leg., R.S., ch. 635, § 2, 2005 Tex. Gen. Laws 1590, 1591. However, which version of the statute applies does not affect our analysis.

ed for 60 days"; and Emeritus, by agreeing to abate the case, agreed to extend the deadline for serving the expert report. In the alternative, Highsmith sought an extension of time in which to file her expert report "pursuant to 74.351." After a hearing, the trial court denied Emeritus's motion to dismiss, stating as follows:

> On July 21st, 2005, the Court considered [Emeritus's] Motion to Dismiss. After considering the evidence and arguments of counsel the Court finds that with regard to any of [Highsmith's] claims that fall within *Chapter 74 Tex. Civ. Prac. & Rem. Code,* the Court DENIES [Emeritus's] motion and GRANTS [Highsmith] an extension pursuant to 74.351 *Tex. Civ. Prac. & Rem. Code.* An agreement was reached to enter an order abating all proceedings for sixty days. The court grants the extension of expert deadlines to August 31, 2005.

> After reviewing the underlying nature of [Highsmith's] claims the Court further finds that [Emeritus] owe[s] [Highsmith] the duty to use reasonable care, including the common law duty recognized for landowners in premise liability cases involving activity on their property.

> Signed this 27th day of July 2005.

On August 5, 2005, Emeritus filed a notice of appeal stating it "desire[s] to appeal from the [July 27th] interlocutory order ... relative to [Emeritus's] motion to dismiss and for relief under Section 74.351(b) of the Texas Civil Practice and Remedies Code." [3] On August 29, 2005, Highsmith served Emeritus with an expert report.

**JURISDICTION**

■ In her motion to dismiss Emeritus's appeal and for sanctions, Highsmith argues this Court lacks jurisdiction over Emeritus's appeal because section 51.014(a)(9) of the Texas Civil Practice and Remedies Code expressly prohibits an appeal from an interlocutory "order granting an extension under section 74.351." We of course agree that section 51.014(a)(9) prohibits an interlocutory appeal of a section 74.351 extension order. *See* TEX. CIV. PRAC. & REM.CODE ANN. § 51.014(a)(9) (Vernon Supp.2005). But is the trial court's extension order what it purports to be—"an order granting an extension under section 74.351"? We hold that it is not. To understand why this is so requires a careful review of the statutory framework.

■ Under section 51.014(a)(9), "[a] person may appeal ... an interlocutory order ... that ... denies all or part of the relief sought by a motion [to dismiss] under Section 74.351(b), except that an appeal may not be taken from an order granting an extension under Section 74.351." *Id.* § 51.014(a)(9). Section 74.351 authorizes two types of extensions: (1) an extension "by written agreement of the affected parties," *id.* § 74.351(a); and (2) an extension by order of the trial court "to cure the deficiency" in a report. *Id.* § 74.351(c). Accordingly, "when *no expert report* is served within 120 days of filing the claim, a trial court has no authority to grant an extension." *Garcia v. Marichalar,* 185 S.W.3d 70, 74 (Tex.App.-San Antonio 2005, order) (emphasis in original) (vacating order that dissolved a previous order that denied the defendant's motion to dismiss and granted an extension "to cure a nonex-

---

3. Emeritus also filed a petition seeking a writ of mandamus to compel the trial court to vacate its extension order. That petition, as well as Emeritus's motion to consolidate that mandamus proceeding with this interlocutory appeal, was denied. *See In re Emeritus Corp.,* No. 04–05–00625–CV, 2005 WL 2290212 (Tex.App.-San Antonio Sept.21, 2005, orig. proceeding).

istent report" because it interfered with or impaired appellant's "right in this interlocutory appeal to seek a dismissal with prejudice"), *disp. on merits,* 198 S.W.3d 250, (Tex.App.-San Antonio, 2006, no pet. h.).

Here, the parties dispute whether Highsmith timely served an expert report. Highsmith argues the agreed abatement extended the deadline for filing an expert report, while Emeritus argues the contrary. But we need not resolve this issue to determine our jurisdiction. It is undisputed that Highsmith had not served an expert report before the trial court signed its July 27th order denying Emeritus's motion to dismiss and purporting to grant Highsmith an extension of time to serve an expert report "pursuant to [section] 74.351...." Accordingly, since no report had been served by July 27th, the trial court's July 27th extension order could not possibly have been to enable Highsmith to cure a deficient report—the only purpose for which a trial court is authorized to grant an extension. Because the trial court's extension order could not possibly have been "an order granting an extension under Section 74.351," we hold the second clause of section 51.014(a)(9) does not deprive this Court of jurisdiction over Emeritus's appeal of the trial court's order denying its motion to dismiss. To hold otherwise would permit a trial court to thwart the legislative purpose in providing for an interlocutory appeal of an order denying a motion to dismiss merely by including a clause granting an extension of time to serve an expert report, however unauthorized.

■ We recognize our holding directly conflicts with the Thirteenth Court of Appeals' holding in *Badiga v. Lopez,* No. 13–04–00452–CV, 2005 WL 1572273 (Tex.App.-Corpus Christi, July 7, 2005, pet. filed) (mem.op.), upon which Highsmith re-

lies. However, *Badiga* fails to consider a pivotal aspect of the statutory framework: section 74.351 simply does not authorize a court-ordered extension for any reason other than to cure a deficient report. For this reason, we believe *Badiga* is wrongly decided and decline to follow it. We likewise reject Highsmith's argument that the trial court's extension order was authorized by section 74.351(a) because it effectuated an "agreement of the affected parties," *i.e.,* the parties' agreement to abate the case, which Highsmith contends implicitly includes an agreement to extend all case-related deadlines for the period of the abatement. Even if an agreement to abate a case were a "written agreement of the affected parties" to extend the "date for serving the report," the extension order here is court-ordered; and a court-ordered extension is simply not authorized by section 74.351(a).

■ In short, we hold that section 51.014(a)(9) authorizes an interlocutory appeal of an order denying a defendant's motion to dismiss in whole or in part *unless* the order also grants a claimant an extension of time pursuant to section 74.351(c) to cure the deficiencies in a timely-served report. We therefore hold this Court is vested with jurisdiction over Emeritus's appeal and deny Highsmith's motion to dismiss.

### MERITS

Emeritus argues the trial court erred in denying Emeritus's motion to dismiss because Highsmith failed to timely serve an expert report. We agree.

#### *Standard of Review*

■ We review the trial court's order denying Emeritus's motion to dismiss under the abuse of discretion standard of review. *See Am. Transitional Care Ctrs. of Tex., Inc. v. Palacios,* 46 S.W.3d 873,

875 (Tex.2001); *Wickware v. Sullivan,* 70 S.W.3d 214, 218 (Tex.App.-San Antonio 2001, no pet.).

### *"Health Care Liability Claim"*

■ An expert report is required only for a health care liability claim, which is statutorily-defined as follows:

"Health care liability claim" means a cause of action [1] against a health care provider or physician [2] for treatment, lack of treatment, or other claimed departure from accepted standards of medical care, or health care, or safety or professional or administrative services directly related to health care, [3] which proximately results in injury to or death of a claimant, whether the claimant's claim or cause of action sounds in tort or contract.

TEX. CIV. PRAC. & REM.CODE ANN. § 74.001(a)(13) (Vernon 2005) (emphasis added). The parties agree the first element is met. Kingsley Place is an assisted living facility, which is encompassed by the statutory definition of a "health care provider." *Id.* § 74.001(a)(11)(B), (12)(A). But the parties disagree on whether the second element is met. Emeritus argues that all of Highsmith's claims are, in substance, health care liability claims, while Highsmith argues her claims are for negligence, premises liability, breach of contract, fraud, violation of the residents' bill of rights found in chapter 247 of the Texas Health and Safety Code, and violation of state statutes requiring the reporting of elder abuse.

■ "To determine whether a cause of action is a health care liability claim that falls under the rubric of the MLIIA [Medical Liability Insurance Improvement Act], we examine the underlying nature of the claim and are not bound by the form of the pleading." *Diversicare Gen. Partner, Inc. v. Rubio,* 185 S.W.3d 842, 847 (Tex.2005).

"A cause of action against a health care provider is a health care liability claim under the MLIIA if it is based on a claimed departure from an accepted standard of medical care, health care, or safety of the patient, whether the action sounds in tort or contract." *Id.* at 848. "A cause of action alleges a departure from accepted standards of medical care or health care if the act or omission complained of is an inseparable part of the rendition of medical services." *Id.* A cause of action alleges a departure from accepted standards of safety if the act or omission complained of "necessarily implicate[s] the accepted standards of safety," which is defined as " 'untouched by danger; not exposed to danger; secure from danger, harm, or loss.' " *Id.* at 855 (quoting BLACK'S LAW DICTIONARY 1336 (6th ed.1990)). This definition of a "health care liability claim" is met when the acts or omissions complained of involve "[p]rofessional supervision, monitoring, and protection of the patient population." *See id.*

■ In Rubio's petition, she alleged her mother, who "suffered from Senile dementia of the Alzheimer's Type" and resided at one of Diversicare's nursing homes, was injured by other nursing home residents as a proximate result of Diversicare's "negligen[ce] in failing to provide adequate supervision and nursing services to meet her fundamental needs; failing to budget for, hire, and train a sufficient number of qualified direct health care staff; failing to develop and implement adequate policies and procedures for safety, training, and staffing at its nursing homes; and for violations of section 22.04 of the Texas Penal Code entitled 'Injury to Child, Elderly, or Disabled Individual.' " *Id.* at 845. Rubio's petition asserted claims for negligence, breach of contract, violations of sections 22.011, 22.021, and 22.04 of the Texas Penal Code, breach of

an implied covenant to provide reasonably safe premises, and fraudulent inducement. *See id.* at 845–46. The supreme court held that all of Rubio's claims were "health care liability claims" under the health care definition because "[t]he supervision and monitoring of Rubio and other nursing home residents and nursing services provided to Rubio by Diversicare's staff were part of her health care." *Id.* at 849–50. The court also held that Rubio's claims were "health care liability claims" under the safety definition because "[p]rofessional supervision, monitoring, and protection of the patient population necessarily implicate the accepted standards of safety under the MLIIA. . . ." *Id.* at 855. Therefore, contrary to Highsmith's contention, a claim may be a "health care liability claim" under the safety definition even if it does not "directly relate[ ] to healthcare."

In her brief, Highsmith generally describes her claims as follows:

> Emeritus . . . fail[ed] to provide a safe and secure environment to [Griffin] while she was a resident at their assisted living facility. . . . Griffin sustained numerous injuries as a result of repeated incidents of resident-on-resident altercations. In their Residential lease agreement, Defendants agreed to provide a safe and secure home by promising to cancel the lease agreement with any resident who posed a risk of injury to themselves or other residents. Plaintiff alleges that Defendants reserved the right, and accepted the duty to revoke the lease of combative or aggressive residents. Plaintiff alleges that Defendants also agreed to provide other protection when they obligated themselves to comply with the state laws requiring the reporting of resident-on-resident altercations to the State of Texas. Plaintiff

claims that her numerous injuries were the direct result of the Defendants['] failure to cancel the lease of combative residents, including Retha Griffin's lease, and failure to report a single resident-on-resident altercation to the State of Texas. . . .

These factual allegations, which form the basis for Highsmith's pleaded claims for negligence, premises liability, breach of contract, fraud, violation of the residents' bill of rights found in chapter 247 of the Texas Health and Safety Code, and violation of state statutes requiring the reporting of elder abuse, involve "[p]rofessional supervision, monitoring, and protection of the patient population." *See Diversicare,* 185 S.W.3d at 855. Accordingly, they "necessarily implicate the accepted standards of safety under the MLIIA." *See id.* We therefore hold that Highsmith's claims, like Rubio's, "may be characterized as departures from accepted standards of safety" and therefore encompassed by the MLIIA. *See id.* Highsmith was therefore required to timely serve an expert report.

### EFFECT OF ABATEMENT

It is undisputed that, by the time Emeritus filed its motion to dismiss, it had been more than 120 days since Highsmith had filed her petition asserting health care liability claims; and she had not served an expert report. Emeritus therefore argues it was entitled to dismissal. Highsmith argues to the contrary on two grounds: (1) the parties' agreement to abate the case extended the deadline for serving her expert report; and (2) the trial court's order abating the case had the legal effect of extending the deadline. Neither argument is expressly addressed in the trial court's July 27th order.[4]

---

4. The trial court did find that "[a]n agreement was reached to enter an order abating all

proceedings for sixty days." In fact, the order granting Emeritus's plea in abatement

## Agreement?

 Highsmith first argues the parties' agreement to abate the case constitutes an agreement under section 74.351(a) to extend "[t]he date for serving the report." However, the order simply states "this case is abated"; and there is no evidence of what the attorneys or the trial court intended by this phrase. Nor is there any evidence the parties or their attorneys agreed to extend the deadline for serving an expert report. The only evidence that even alludes to such an agreement can be found in the affidavit of Highsmith's attorney, in which she states that it was her "understanding that ... the agreement included the suspension of all matters, including the suspension of any deadline to file expert reports ... [and] that the agreement ... prohibited the filing of any expert reports during that time." A unilateral understanding, however, is not an agreement, as the affidavit implicitly recognizes in what it does not state: It does not state the attorneys agreed the abatement would extend the deadline; it does not state the issue was even discussed; and it does not state that Emeritus or its attorney did or said anything that would lead a reasonable person to understand an agreement had been reached to extend the deadline for serving an expert report.

Under these circumstances, we hold the parties' agreement to abate the case was simply that: an agreement to "abate the case" for sixty days. We therefore turn to the legal question of whether an abatement extends the deadline for serving an expert report.

## Consequences of Abatement

The MLIIA does not address whether an abatement extends the deadline for

serving an expert report; and the supreme court has not yet confronted the issue. Two courts of appeals have addressed the issue. The Dallas Court of Appeals held that an abatement for the purpose of allowing a plaintiff to give an insurance company a pre-suit notice required by the Texas Insurance Code extended the deadline. *Campbell v. Kosarek*, 44 S.W.3d 647, 648, 650 (Tex.App.-Dallas 2001, pet. denied). The Amarillo Court of Appeals disagreed, holding a sixty-day abatement to permit the plaintiff to comply with the pre-suit notice required in a health care liability claim did not extend the deadline for serving an expert report. *See Hagedorn v. Tisdale*, 73 S.W.3d 341, 348–49 (Tex. App.-Amarillo 2002, no pet.). In reaching this conclusion, Chief Justice Boyd, writing for the court, reasoned as follows:

> We are disturbed by the fact that, if an abatement for failure to give the required notice under the act automatically extends the deadline for filing the medical expert report, a plaintiff would in fact be rewarded with additional time for the filing of his report by his failure to comply with the statutory notice requirement. In other words, a health care provider would be placed in the position of having to choose whether to seek an abatement for the failure of the plaintiff to give him the statutorily required 60–day notice or to hold the plaintiff to the statutorily required deadline for filing the expert report. We cannot believe that the intent of the legislature to discourage frivolous lawsuits and encourage settlement of claims would be served by such a construction, since the legislature has determined that failing to timely file an expert report

simply states "that this case is abated until 60 days from the date Defendants receive notice

of a health care claim...."

means that the claim is either frivolous or at best has been prematurely brought. *See American Transitional Care Centers of Texas, Inc. v. Palacios,* 46 S.W.3d 873, 878 (Tex.2001). *Id* at 348. The court went on to note that, in light of the plaintiff's prerogative "to some extent" to choose when suit is filed and then-existing means for obtaining an extension of the deadline, it "fail[ed] to see how the claimant is damaged by being required to adhere to the statutory requirement." *See id.* The Fort Worth Court of Appeals appears to have agreed with the Amarillo Court, at least implicitly. *See Moseley v. Behringer,* 184 S.W.3d 829, 831, 835 (Tex.App.-Fort Worth 2006, no pet.).[5] We note this holding is not inconsistent with the law of abatement generally; an abatement does not necessarily stay all proceedings. *See De Checa v. Diagnostic Ctr. Hosp., Inc.,* 852 S.W.2d 935, 938 n. 5 (Tex.1993) (noting that plaintiff remains free during abatement to join additional defendants); *United Oil & Minerals, Inc. v. Costilla Energy, Inc.,* 1 S.W.3d 840, 846 (Tex.App.-Corpus Christi 1999, pet. dism'd) (holding abatement did not preclude plaintiff from settling and voluntarily dismissing or non-suiting claim).

▮▮▮ We are persuaded by the Amarillo Court of Appeals' reasoning in *Hagedorn* and therefore hold an agreement to abate a case to permit a plaintiff to comply with the sixty-day notice requirement does not in and of itself extend the time for serving an expert report. If a plaintiff wants an extension of time, it must either enter an explicit written extension agreement with the defendant or assume the risk of serving a deficient report and seeking an extension to cure the deficiency from the trial court. Because Highsmith did neither, the trial court was required to dismiss her health care liability claims with prejudice.

### CONCLUSION

In sum, we hold this Court's jurisdiction over Emeritus's interlocutory appeal of the trial court's order denying Emeritus's motion to dismiss is not defeated by the trial court's simultaneously granting Highsmith's request for an extension of time to serve her expert report because the extension was not granted to permit Highsmith to cure a deficiency in an existing report; all of Highsmith's claims are health care liability claims; and the agreement to abate the case for sixty days to permit Highsmith to comply with the sixty-day notice requirement did not automatically extend the 120–day statutory deadline to serve the required expert report. We therefore reverse the trial court's order and render judgment dismissing Highsmith's claims with prejudice.

---

**5.** The deadline for serving the expert report in *Moseley* was February 25, 2004. *Moseley,* 184 S.W.3d at 831. When a report had not been served by March 8, 2004, the defendants filed motions to dismiss with prejudice. *Id.* At the subsequent April 8 hearing, the plaintiffs argued the deadline was extended until May 10, 2004 "due to a prior seventy-five day abatement." *Id.* The court held that, "at the time of the hearing in this case the trial court had only two options: it could have dismissed with prejudice or it could have granted [the plaintiffs'] request for a grace period extension. . . ." *Id.* at 835. Obviously, an extension would not have been required by the time of the hearing on April 8 if, as the plaintiffs argued, the abatement had extended the deadline until May 10.