**Opinion issued August 20, 2020**



In The

# Court of Appeals

For The

# First District of Texas

————————————

## NO. 01-18-00984-CV

————————————

**BELMONT VILLAGE HUNTERS CREEK TRS, LLC, BELMONT THREE, LLC, BELMONT VILLAGE HUNTERS CREEK, LLC, BELMONT VILLAGE, L.P. AND BELMONT BP INVESTORS, LLC, Appellants**

**V.**

**WILLIAM MARSHALL, INDIVIDUALLY AND AS EXECUTOR OF THE ESTATE OF CHARLOTTE MARSHALL, DECEASED, CATHERINE MARSHALL AND DAVID MARSHALL, Appellees**

On Appeal from the 164th District Court
Harris County, Texas
Trial Court Case No. 2017-75214

# O P I N I O N

Charlotte Marshall, an elderly woman with dementia, was a resident at

Belmont Village, an assisted living facility in Houston. Royland Pringle, an

employee of Belmont Village, raped Charlotte in her unit in Belmont Village. After Charlotte died, her children—the appellees, William Marshall, individually and as executor of the Estate of Charlotte Marshall, Deceased; Catherine Marshall; and David Marshall—sued Pringle for sexual assault and, additionally, sued Belmont Village for premises liability. The trial court denied Belmont Village's motion to dismiss, which asserted that the Marshalls' claim was a health care liability claim and that they had failed to provide an expert report as required by the Texas Medical Liability Act (TMLA). *See* TEX. CIV. PRAC. & REM. CODE chapter 74.

Belmont Village contends in this interlocutory appeal that the trial court erred in denying its motion to dismiss. We affirm.

## Background

On November 29, 2014, Charlotte entered into a contract—a "Residence and Services Agreement"—with Belmont Village Hunters Creek, LLC.[1] The agreement states that it operates an "Assisted Living Facility" known as Belmont Village that provides "residency, care and services" and provided for Charlotte to reside in a unit at Belmont Village. The agreement's introduction states in part:

> Belmont Village provides certain Core Services to all residents. Belmont Village also offers Support Services in addition to Core Services. Your Support Services will depend on your needs and may vary from time to time. *The purpose of this Agreement is to provide a*

---

[1] We refer to appellants Belmont Village Hunters Creek TRS, LLC, Belmont Three, LLC, Belmont Village Hunters Creek, LLC, Belmont Village, L.P. and Belmont Investors, LLC collectively as Belmont Village.

2

*statement of the services that will be furnished to you* at the Community [Belmont Village], and to describe the other legal obligations that Belmont Village will assume. This Agreement also sets forth your legal obligations to Belmont Village, both financial and otherwise.

(Emphasis added.) Section II.D. of the agreement provides:

**D. Excluded Services**

*Belmont Village shall not be responsible for furnishing or paying for any health care items or services*, including but not limited to physicians' services, psychiatric services, nursing services, surgery, hospital care, treatment or examination of eyes or teeth, medications, vitamins, eyeglasses, contact lenses, hearing aids, orthopedic appliances, prosthetic devices, transportation other than that set forth in this Agreement, laboratory tests, x-ray services, home health services and private duty aides or attendants. If you receive services from outside service providers, Belmont Village does not assume responsibility for oversight of such services; however, the provision of services by outside providers at your Residence or the Community shall at all times remain subject to the policies of Belmont Village and the Resident Handbook.

(Emphasis added.)

Charlotte obtained health care from "outside service providers" while she lived at Belmont Village. For example, she received medical care from Altus Health Care and Memorial Hermann and podiatric treatment from an outside podiatrist. Belmont Village was not involved in providing these services.

The agreement also included an "Assisted Living and Dementia Neighborhoods Support Services Agreement," which provides in pertinent part:

**K. Excluded Services.** *Belmont Village shall not be responsible for furnishing or paying for any health care items or services*, including but not limited to physicians' services, psychiatric services, nursing services,

surgery, hospital care, treatment or examination of eyes or teeth, medications, vitamins, eyeglasses, contact leases, hearing aids, orthopedic appliances, prosthetic devices, transportation other than what is set forth in this Agreement, laboratory tests, x-ray services, home health services and private duty aides or companions.

(Emphasis added.)

The Residence and Services Agreement provided for a monthly fee payable to appellant Belmont BP Investors LLC in the total amount of $7,130, which included a $730 monthly fee for the "Assisted Living and Dementia Neighborhoods Support Services Agreement."

In their suit, the Marshalls allege that on November 9, 2015, Pringle, an employee of Belmont Village who was on duty, entered Charlotte's residence and sexually assaulted her. The Marshalls allege that Charlotte was unable to raise an alarm or fend off the attack. While the sexual assault was occurring, another employee entered Charlotte's residence, observed the sexual assault, and notified other staff members who intervened and alerted law enforcement. Charlotte was taken to a hospital where a rape kit was performed, and the kit confirmed the sexual assault by Pringle.[2]

The Marshalls allege that Belmont Village did not provide standard security measures, such as locks or other alarm systems, to prevent staff from inappropriately

---

[2] Pringle was convicted of aggravated sexual assault of an elderly or disabled person and was sentenced to life in prison.

4

entering residents' rooms, and that Belmont Village failed to install a lock on Charlotte's door. The Marshalls assert that Pringle exploited this lack of security to sexually assault Charlotte. Under what they term a "standard landlord liability theory," they allege a premises liability claim against Belmont Village for its failure to provide adequate security to Charlotte.

Belmont Village filed a motion to dismiss the Marshalls' claim against it, asserting that Belmont Village, as an assisted living center, was a health care provider under the TMLA, that the Marshalls' claim was a health care liability claim, and that, because they were required but failed to provide an expert report under the TMLA, their claims against Belmont Village must be dismissed. The Marshalls filed a response to the motion to dismiss. After a hearing, the trial court denied the motion. Belmont Village's sole issue asserts that the Marshalls' claim is a health care liability claim and that the trial court should have granted the motion to dismiss.

**Analysis**

The TMLA defines a health care liability claim as:

> A cause of action against a health care provider or physician for treatment, lack of treatment, or other claimed departure from accepted standards of medical care, or health care, or safety or professional or administrative services directly related to health care, which proximately results in injury to or death of a claimant, whether the claimant's claim or cause of action sounds in tort or contract.

TEX. CIV. PRAC. & REM. CODE § 74.001(a)(13); *see Bioderm Skin Care, LLC v. Sok*, 426 S.W.3d 753, 758 (Tex. 2014). If, when considered against the statutory

5

requirements of section 74.001(a)(13), a claimant's cause of action is a health care liability claim, the claimant must serve the defendant with an expert report within 120 days of the defendant's original answer. TEX. CIV. PRAC. & REM. CODE § 74.351(a); *Houston Methodist Willowbrook Hosp. v. Ramirez*, 539 S.W.3d 495, 498 (Tex. App.—Houston [1st Dist.] 2017, no pet.). If the claimant fails to serve an expert report on the defendant within 120 days, the trial court shall, on the motion by the defendant, enter an order that dismisses the claim with prejudice and awards the defendant reasonable attorney's fees and court costs. TEX. CIV. PRAC. & REM. CODE § 74.351(b). Because it is undisputed that the Marshalls did not serve an expert report on Belmont Village, we must determine whether their claim is a health care liability claim under Chapter 74. *See Baylor Scott & White Med. Ctr. v. Weems*, 575 S.W.3d 357, 363 (Tex. 2019) (holding that if claim is health care liability claim and no report is served, suit must be dismissed).

To be a health care liability claim under the TMLA, a claim must contain three elements:

> (1) a physician or health care provider must be a defendant; (2) the claim or claims at issue must concern treatment, lack of treatment, or a departure from accepted standards of medical care, or health care, or safety or professional or administrative services directly related to health care; and (3) the defendant's act or omission complained of must proximately cause the injury to the claimant.

*Bioderm*, 426 S.W.3d at 758 (quoting *Tex. W. Oaks Hosp., LP v. Williams*, 371 S.W.3d 171, 179-80 (Tex. 2012)); *see Ramirez*, 539 S.W.3d at 498. "No one

6

element, occurring independent of the other two, will recast a claim into a health care liability claim." *Bioderm*, 426 S.W.3d at 758.

The party moving for dismissal has the burden of proving that the cause of action is a health care liability claim. *Ramirez*, 539 S.W.3d at 498 (citing *Reddy v. Veedell*, 509 S.W.3d 435, 438 (Tex. App.—Houston [1st Dist.] 2014, pet. denied)). The TMLA, however, creates a rebuttable presumption that a plaintiff's claim is a health care liability claim if it is brought against a physician or health care provider and "is based on facts implicating the defendant's conduct during the course of a patient's care, treatment, or confinement." *Loaisiga v. Cerda*, 379 S.W.3d 248, 256 (Tex. 2012).

Our standard of review of a trial court's ruling on a motion to dismiss depends on the precise issue being reviewed.

> A ruling on a motion to dismiss a health care liability claim pursuant to the Texas Medical Liability Act (TMLA) is generally reviewed for abuse of discretion. *See Am. Transitional Care Ctrs. of Tex., Inc. v. Palacios*, 46 S.W.3d 873, 875 (Tex. 2001). However, we review de novo whether a particular cause of action is a health care liability claim. *Bioderm Skin Care, LLC v. Sok*, 426 S.W.3d 753, 757 (Tex. 2014). In doing so, we "consider the entire record, including the pleadings, motions, responses, and relevant evidence properly admitted." *See, e.g.*, *Shah v. Sodexo Servs. of Tex. L.P.*, 492 S.W.3d 413, 416–17 (Tex. App.—Houston [1st Dist.] 2016, no pet.).

*Ramirez*, 539 S.W.3d at 498. If the record does not affirmatively show that the plaintiff's claim is a health care liability claim, the statutory expert-report

requirement does not apply. *Id.* (citing *Ross v. St. Luke's Episcopal Hosp.*, 462 S.W.3d 496, 505 (Tex. 2015)).

## A. Element One: Whether Belmont Village is a Health Care Provider

It is not in dispute that Belmont Village, an assisted living facility licensed under Health and Safety Code Chapter 247, satisfies the first element of whether the defendant meets the statutory definition of "health care provider." Under the TMLA, a "[h]ealth care provider means any . . . institution duly licensed . . . by the State of Texas to provide health care, including . . . a health care institution." TEX. CIV. PRAC. & REM. CODE §§ 74.001(a)(12)(A)(vii). And more specifically, "health care institution includes . . . an assisted living facility licensed under Chapter 247, Health and Safety Code." *Id.* § 74.001(a)(11)(B); *see Emeritus Corp. v. Highsmith*, 211 S.W.3d 321, 327 (Tex. App.—San Antonio 2006, pet. denied) (finding first statutory element satisfied because "Kingsley Place is an assisted living facility, which is encompassed by the statutory definition of a 'health care provider.'").

## B. Element Two: Whether the Claim Concerned Health Care or Safety Related to Health Care

The issue raised by Belmont Village goes to the second statutory element: does the Marshalls' claim concern treatment, lack of treatment, or a departure from accepted standards of medical care, or health care, or safety or professional or administrative services directly related to health care? Relying primarily on *Diversicare General Partner, Inc. v. Rubio*, Belmont Village argues that a health

8

care facility's failure to protect a resident from sexual assault is a health care liability claim. *See* 185 S.W.3d 842, 849, 855 (Tex. 2005).

The Marshalls, however, allege that Belmont Village was negligent in failing to exercise reasonable care in providing security services "necessary for [Charlotte's] protection." They contend that this is a typical claim against a landlord, citing the Restatement (Second) of Torts § 344 (1965), and they assert that Texas law has long provided that "[a] landlord 'who retains control over the security and safety of the premises' may be held liable to invitees for criminal acts by third parties, if, and only if, the criminal acts were foreseeable." *Tex. Real Estate Holdings, Inc. v. Quach*, 95 S.W.3d 395, 397 (Tex. App.—Houston [1st Dist.] 2002, pet. denied) (quoting *Timberwalk Apartments, Partners, Inc. v. Cain*, 972 S.W.2d 749, 756 (Tex. 1998)). The Marshalls argue that, rather than implicating the providing of health care, their claim against Belmont Village "involve[s] basic security requirements (absence of locks, security devices, and so forth) that are routinely brought against building owners" generally. They further argue that they make no health-care related complaints and point out that Belmont Village twice contractually disclaimed that it was providing health care to Charlotte.[3]

---

[3] In their petition, the Marshalls alleged:

> Defendant BELMONT VILLAGE HUNTERS CREEK, LLC and BELMONT BP INVESTORS, LLC, entered into a written contract with CHARLOTTE MASHALL, deceased, for "Core Services."

9

To be a healthcare liability claim, the Marshalls' claim must concern treatment, lack of treatment, or a departure from accepted standards of medical care, or *health care*, or *safety* or professional or administrative services directly related to health care. *See Bioderm*, 426 S.W.3d at 758 (emphasis added).

---

These services specifically included such items as furnishing a place to live, housekeeping services, meals, and optional services, but *specifically excluded any responsibility for furnishing or paying for any "health care items or services" including medications, private aids, nursing care, physician care, laboratory care and home health services*. The cost of such services [was] $7,130.00 paid monthly to Defendant BELMONT BP INVESTORS LLC. An addendum to the contract also offered "Support Services" such as personal care assistance, for an additional monthly charge of $730, but *Defendants again made clear that "Support Services" did not include any type of healthcare or medical care*.

(Emphasis added.) This pleading is a specific reference to the two above-quoted contractual exclusions.

In their response to Belmont Village's motion to dismiss, the Marshalls asserted that Belmont Village "expressly stipulated that it did not provide its residents healthcare services." *Cf. Masterson v. Bouldin*, 151 S.W.2d 301, 307 (Tex. Civ. App.—Eastland 1941, writ ref'd) (noting estoppel by contract is "estoppel to deny the truth of facts agreed upon and settled by force of entering into the contract."); *id.* ("If, in making a contract, the parties agree upon or assume the existence of a particular fact as the basis of their negotiations, they are estopped to deny the fact so long as the contract stands, in the absence of fraud, accident or mistake."). The Marshalls further argued, "Despite expressly denying that it would provide any healthcare services to [Charlotte] Marshall, Belmont now seeks to avoid liability for the sexual assault that occurred at its residence on the theory that it provided her healthcare services. Based on this new position, it claims that Marshall's claims are healthcare liability claims under Chapter 74, which require an expert report."

10

The TMLA defines "health care" as "any act or treatment performed or furnished, or that should have been performed or furnished, by any health care provider for, to, or on behalf of a patient during the patient's medical care, treatment, or confinement." TEX. CIV. PRAC. & REM. CODE § 74.001(a)(10).

Safety is not defined by the TMLA, but the Supreme Court of Texas has stated that "safety" is accorded its common meaning as "the condition of being untouched by danger; not exposed to danger; secure from danger, harm or loss." *Ross*, 462 S.W.3d at 501 (internal quotations omitted). The supreme court has recognized that "the statute's phrase 'directly related to health care' does not modify its reference to safety standards." *Id.* at 504; *see also Rubio*, 185 S.W.3d at 855 ("[T]he Legislature's inclusion within the scope of the [TMLA] of claims based on breaches of accepted standards of 'safety' expands the scope of the statute beyond what it would be if it only covered medical and health care."). Nevertheless, the court has held that the legislature must have intended that a relationship between safety standards and the provision of health care exist for a claim to fall within Chapter 74, "given the legislative intent explicitly set out in the TMLA and the context in which 'safety' is used in the statute." *Ross*, 462 S.W.3d at 504.

Thus, there must be "a substantive nexus between the safety standards allegedly violated and the provision of health care." *Ross*, 462 S.W.3d at 504; *see Cage v. Methodist Hosp.*, 470 S.W.3d 596, 602 (Tex. App.—Houston [1st Dist.]

11

2015, no pet.). This nexus depends on "whether the standards on which the claim is based implicate the defendant's duties as a health care provider, including its duties to provide for patient safety." *Ross*, 462 S.W.3d at 505; *see Cage*, 470 S.W.3d at 602.

Belmont Village contends that the Marshalls' claim involves allegations of alleged departures from both (1) accepted standards of "health care" and (2) accepted standards of safety "directly related to health care." We address these contentions in turn.

### 1.   *Whether the claim concerns health care*

In asserting that the Marshalls' claim implicates the provision of health care, Belmont Village relies on *Rubio*, and it contends that the supreme court in *Rubio* established that a health care facility's ongoing duty to protect its patients or residents from assault *is* health care. *See Rubio*, 185 S.W.3d at 854–55. We disagree that *Rubio* is dispositive of this case.

*Rubio*, decided under the TMLA's predecessor statute, was a suit against a nursing home by a nursing home resident who had been sexually assaulted by another resident, and the plaintiff primarily alleged that the nursing home failed to provide adequate supervision to protect her from sexual assault. *Id.* at 845. The supreme court held that the plaintiff's claims were causes of action for departures

12

from accepted standards of professional health care and safety and thus were health care liability claims governed by the TMLA's predecessor statute. *Id.* at 845, 855.

The majority in *Rubio* did not address the factual scenario and the premises liability claim presented in this case. However, it did anticipate similar arguments in responding to Chief Justice Jefferson's concurring and dissenting opinion, which asserted that some of the plaintiff's allegations raise a premises liability claim. *See Rubio*, 185 S.W.3d at 854; *id.* at 855–58 (Jefferson, C.J., concurring and dissenting). The majority emphasized that the plaintiff in *Rubio* was "not complaining about an unlocked window that gave an intruder access" and noted that there "may be circumstances that give rise to premises liability claims in a healthcare setting that may not be properly classified as health care liability claims, but those circumstances are not present here." *Id.* at 854. We therefore disagree with Belmont Village that *Rubio* settled the issue before us. In fact, a close look at *Rubio* undermines Belmont Village's contention that it is applicable to this case.

The health care facility in *Rubio* was a nursing home, and the court emphasized the nature of the services that a nursing home provides in making its ruling:

> A nursing home provides services to its patients, often around the clock, which include supervising daily activities; providing routine examinations and visits with physicians; providing dietary, pharmaceutical, and routine dental services; monitoring the physical and mental conditions of its residents; administering medications; and meeting the fundamental care needs of the residents. . . . These services

13

are provided by professional staff including physicians, nurses, nurse aides, and orderlies who care for the residents.

*Id.* at 849–50.

The court distinguished the duty of a nursing home to its patients from that of a premises owner to its invitees:

> The obligation of a health care facility to its patients is not the same as the general duty a premises owner owes to invitees. *Health care staff make judgments about the care, treatment, and protection of individual patients* and the patient populations in their facilities based on the mental and physical care the patients require. The health care standard applies the ordinary care of trained and experienced *medical professionals* to the treatment of patients entrusted to them. Premises owners similarly owe a duty of care to their residents and invitees, but the duty is of ordinary care with *no general medical duty to diagnose and treat their residents*. . . . Residents are in a nursing home for care and treatment, not merely for shelter.

*Id.* at 850–51 (emphases added) (internal citations omitted).

In concluding that the plaintiff in *Rubio* did not allege a common law claim for premises liability, the court stated, "We do not distinguish Rubio's health care claims from premises liability claims 'simply because the landowner is a health care provider' but because the gravamen of Rubio's complaint is the alleged failure of Diversicare to implement adequate policies to care for, supervise, and protect its residents who require *special medical care*." *Id.* at 854 (emphasis added).

Texas law defines an assisted living facility as one that provides "food and shelter" and either "personal care services" or "administration of medication." TEX. HEALTH & SAFETY CODE § 247.002(1). It allows assisted living facilities flexibility

14

by listing several other nursing and other health care services that an assisted living facility "may," but is not required to, provide. *See id.* § 247.002. As highlighted above, Belmont Village twice disclaimed that it would provide health care to Charlotte, who was to obtain and receive health care from outside providers.

In contrast to *Rubio*, the services provided by Belmont Village on a regular basis involved personal care, not health care: bathing assistance, toileting reminders and assistance, dressing and grooming. Belmont Village also provided some household services and day-to-day activities: laundry services, housekeeping daily reminders, "cueing and drawing out of resident," and "escort assistance." Although Belmont Village conducted daily "wellness checks," its contract emphasized that these were of a "non-medical nature" and merely assured these non-medical tasks were completed. The only arguable health care that it provided was medication distribution, but the Marshalls' claim does not arise from any alleged failure in the distribution of medication.

The crucial distinction between a nursing home and Belmont Village, an assisted living facility, is that a nursing home provides personal care *and* health and medical care, while Belmont Village provided almost only personal care. This distinction renders *Rubio* inapplicable. Moreover, while the definition of "health care" is broadly defined, *Loaisiga*, 379 S.W.3d at 255, it is not boundless. In *Rubio*, the supreme court articulated a limiting test: "A cause of action alleges a departure

15

from accepted standards of medical care or health care if the act or omission complained of is an inseparable part of the rendition of medical services." 185 S.W.3d at 848. The Marshalls' claim that Charlotte's unit was unsafe because Belmont Village did not allow her to have a lock on her unit door does not allege an act or omission that is "an inseparable part of the rendition of medical services" by Belmont Village.

For the above reasons, we conclude that the Marshalls' claim does not involve allegations of an alleged departure from accepted standards of "health care."

### 2. *Whether the claim concerns safety standards related to health care*

We next turn to Belmont Village's argument that the Marshalls' claim nevertheless involves allegations of an alleged departure from accepted standards of safety "directly related to health care." Precedent from the Supreme Court of Texas makes clear that there must be "a substantive nexus between the safety standards allegedly violated and the provision of health care." *Ross*, 462 S.W.3d at 504.

In *Ross*, the court set forth a list of non-exclusive considerations to help courts determine whether there is a substantive nexus between the safety standards allegedly violated and the provision of health care:

1. Whether the alleged negligence occurred in the course of the defendant's performing tasks with the purpose of protecting patients from harm;

2. Whether the alleged injuries occurred in a place where patients were receiving care, so that the obligation of the provider to protect persons who require medical care was implicated;

3. Whether the plaintiff was seeking or receiving health care when the alleged injuries occurred;

4. Whether the plaintiff was providing or assisting in providing health care when the injuries occurred;

5. Whether the alleged negligence arises from safety standards that are part of the professional duties owed by the health care provider;

6. If an instrumentality was involved in the defendant's alleged negligence, whether it was a type used in providing health care; or

7. Whether the alleged negligence implicated safety-related requirements set for health care providers by governmental or accrediting agencies.

*Ross*, 462 S.W.3d at 505. When we examine these factors or considerations, we focus on the essence of the cause of action. *Bain v. Capital Senior Living Corp.*, No. 05-14-00255-CV, 2015 WL 3958714, at *3 (Tex. App.—Dallas June 30, 2015, pet. denied) (mem. op.). The pivotal issue is whether the safety standards implicated the defendant's duties as a health care provider. *See Ross*, 462 S.W.3d at 505.

Here, we note that factor four—whether the plaintiff was providing or assisting in providing health care when the injuries occurred—and factor six—whether an instrumentality involved was a type used in providing health care—do

17

not apply. Furthermore, the analysis under factors five and seven are related and should be considered together in this case. We discuss these factors in turn below.

> *Factor 1: Whether the alleged negligence occurred in the course of the defendant's performing tasks with the purpose of protecting patients from harm*

The parties vigorously contest this factor. Belmont Village correctly points out that the gist of the Marshalls' claim is that Belmont Village failed to provide locks or adequate security for Charlotte in her unit. But the Marshalls contend that their claim concerns the protection of Charlotte as a resident, not as a patient. The Marshalls assert that Belmont Village's safety and security obligations are related to Charlotte's capacity as a resident in an independent apartment, regardless of whether she received care there or not, and that the alleged failures had nothing to do with protecting "patients" from harm. The Marshalls also argue that Belmont Village's contract with Charlotte, and its exclusions, are significant here because the contract language is probative of what services Belmont provided. We agree with the Marshalls.

The agreement expressly stated that its purpose was "to provide a statement of services that [would] be furnished" to Charlotte as a resident. In two different locations, it expressly excluded health care services from its list of provided services. It stated, "Belmont Village shall not be responsible for furnishing or paying for any health care items or services, including but not limited to" physicians' services,

18

nursing services, home health services, and private duty aides or attendants. The agreement further stated that "Belmont Village does not assume responsibility for oversight of such [health care] services." The record further demonstrates that Charlotte obtained health care from "outside service providers" at Belmont Village, such as Altus Health Care and Memorial Hermann. Belmont Village was not involved in providing these services.

This evidence of services provided by Belmont Village is especially important in the context of an assisted living facility because these facilities range from apartment complexes that provide essentially no health care, like Belmont Village, to full-service, nursing home-like facilities. The contract demonstrates that Belmont Village did not intend to provide health care to Charlotte, and the entire record further demonstrates that Belmont Village, in fact, did not provide such services.

Belmont Village likewise failed to show that it had a *special* duty—different from a general business—to a *patient*. A safety claim does not fall under Chapter 74 if "the safety standards at issue" are "the same standards many businesses generally have . . . ." *Reddic v. E. Tex. Med. Ctr. Reg'l Health Care Sys.*, 474 S.W.3d 672, 676 (Tex. 2015); *see Ross*, 462 S.W.3d at 503; *Galvan v. Mem'l Hermann Hosp. Sys.*, 476 S.W.3d 429, 432–33 (Tex. 2015). Belmont Village argues generally that it had a duty to protect residents like Charlotte as part of providing health care; but, as we discussed above, this contention is contradicted by its own carefully designed

19

contract and practice of operating Belmont Village more like an apartment complex than a nursing facility or health care provider.

We conclude that this factor does not support a health-care nexus or does so only slightly.

> *Factor 2: Whether the alleged injuries occurred in a place where patients were receiving care, so that the obligation of the provider to protect persons who require medical care was implicated*

Belmont Village argues that, because the sexual assault occurred in Charlotte's unit, this factor supports a health-care nexus. The Marshalls point to *Houston Methodist Willowbrook Hospital v. Ramirez*, a case in which the plaintiff, a patient, slipped and fell in a hallway while walking from her primary care doctor's office to the radiology room. 539 S.W.3d 495, 500 (Tex. App.—Houston [1st Dist.] 2017, no pet.). This court held that, because the patient was "between the elevator and the entry to the radiology department" and was therefore not receiving care at the time of the fall, the second factor was not satisfied. *Id.*

Nothing in the record reflects that Charlotte received medical care from Belmont Village in her unit where the sexual assault occurred, much less that she was receiving health care at the time she was sexually assaulted. *See id.* Moreover, Belmont Village's contract stated that it did not provide health care in a resident's unit. As discussed above, in light of these contractual provisions and other record evidence, Belmont Village has not established that Charlotte was living at the facility

20

in order to receive health care. Rather, Belmont Village provided personal care assistance, and her medical needs were addressed by other parties.

Therefore, we conclude that this factor does not support a health-care nexus.

*Factor 3: Whether the plaintiff was seeking or receiving health care when the alleged injuries occurred*

Nothing in the record indicates that Pringle was providing health care to Charlotte when he sexually assaulted her. Yet, Belmont Village argues that, under *Rubio*, its ongoing duty to protect residents from assault *is* health care and supports a healthcare nexus. But "[a] patient's claim against a medical provider for assault . . . is not [a health care liability claim] if the only possible relationship between the alleged improper conduct and the rendition of medical services or health care was the setting in which the conduct took place." *Ross*, 462 S.W.3d at 503 (citing *Loaisiga*, 379 S.W.3d at 257). To conclude otherwise would render the other factors meaningless. *See id.* Because Belmont Village has failed to demonstrate any relationship between its employee's improper conduct (or its own negligence) and the rendition of medical services other than its assertion that it is a health care facility that provided a setting for the sexual assault, we conclude that this factor does not support a health-care nexus.

21

*Factors 5&7: Whether the alleged negligence arises from or implicates safety standards that are part of the professional duties owed by the health care provider or are required by governmental or accrediting agencies*

Belmont Village asserts again that *Rubio* is determinative of these factors, quoting the majority's statement that the determination of the "nature and intensity" of the care and supervision required of each nursing home resident "are judgments made by professionals trained and experienced in treating and caring for patients and the patient populations in their health care facilities." 185 S.W.3d at 850.

Belmont Village also contends that its duties to provide safety to residents like Charlotte implicate an assisted living facility's statutory obligation to maintain quality of care by providing humane treatment and safe surroundings to residents. *See* TEX. HEALTH & SAFETY CODE § 247.0011(2), (7). Similarly, Belmont Village asserts that the standards and licensing requirements for assisted living facilities includes keeping residents free from abuse, neglect, and exploitation. *See* 40 TEX. ADMIN. CODE § 92.125(a)(3)(A), (E)((ii), (F).[4] Belmont Village notes that "abuse" is specifically defined to include "sexual abuse of a resident, including any involuntary or nonconsensual sexual conduct that would constitute an offense under Section 21.08, Penal Code (indecent exposure), or Chapter 22, Penal Code

---

4 We note that these provisions were transferred to 26 TEX. ADMIN. CODE § 553.125 effective May 1, 2019. We cite to the law as it existed when the trial court considered this issue and when the parties filed their briefing.

22

(assaultive offenses), committed by the resident's caregiver, family member, or other individual who has an ongoing relationship with the resident." *Id.* § 92.2(1).[5] It further points out that assisted living facilities must ensure that their staff is trained to report abuse, enforce residents' rights, and provide safety measures to prevent accidents and injuries. *Id.* § 92.41(a)(4)(A)(i), (v), (B)(iii).[6]

The Marshalls respond that these factors weigh against applying Chapter 74 because, for these factors to be satisfied, Belmont Village must show that "regulatory mandates" specific to assisted living facilities—and not some other general tort duty—"would have been [its] reason for [the activity complained of]." *Galvan*, 476 S.W.3d at 432. That standard is not met if the standards "may also be the same standards many businesses generally have . . . ." *Id.*

Belmont Village does not cite to any specific standards applicable here that create special duties or requirements for assisted living facilities that differ from a general apartment complex. It instead relies on only general regulations compelling assisted living facilities to provide for residents' security. The supreme court has held that evidence of such general safety standards does not implicate Chapter 74. *See Reddic*, 474 S.W.3d at 676; *Ross*, 462 S.W.3d at 503.

---

[5] This provision was transferred to 26 TEX. ADMIN. CODE § 553.2(1) effective May 1, 2019.

[6] These provisions were transferred to 26 TEX. ADMIN. CODE § 553.41 effective May 1, 2019.

*Reddic* rejected a hospital's argument that factors five and seven weighed in Chapter 74's favor because general regulations compelled it to keep the premises safe. *Reddic*, 474 S.W.3d at 676. The supreme court noted that the plaintiff's "claim is for the hospital's failing to properly inspect and maintain its floor mats in the lobby, regardless of whether" the specific safety regulations were themselves met. *Id.* The supreme court held:

> As for general safety standards such as federal regulations requiring hospitals to maintain facilities "to ensure an acceptable level of safety," 42 C.F.R. § 482.41(c)(2), we noted in *Ross* that hospital standards for floor maintenance "may also be the same standards many businesses generally have for maintaining their floors." 462 S.W.3d at 503. We said that "[t]he pivotal issue in a safety standards-based claim is whether the standards on which the claim is based implicate the defendant's duties as a health care provider, including its duties to provide for patient safety." *Id.* at 505. Although hospitals are required by regulation to ensure an acceptable level of safety for those within its confines, the record does not show that the safety standards at issue here are related to the provision of health care by more than the location of Reddic's fall being inside a hospital. That is, the record does not support a conclusion that safety standards regarding maintenance of the floor and mats where Reddic fell were substantively related to the safety of patients receiving health care or persons seeking health care.

*Id.* Here, as in *Reddic*, although Belmont Village is required to ensure an acceptable level of safety for its residents, the record does not show that the safety standards relevant to Charlotte's assault are related to the provision of health care, other than by showing that the assault occurred within the facility. Belmont Village has failed to produce a record showing that the applicable facility standards are more than "the same standards many businesses generally have . . . ." *See id.*

24

This Court likewise held in *Ramirez* that these factors only weigh in favor of Chapter 74 if the defendant meets its burden to show that the plaintiff's "claims implicate any duties that are specific to health care providers." *Ramirez*, 539 S.W.3d at 500. References to general "safety[] and sanitation requirements," such as a general requirement to "provide a sanitary environment," did not weigh in favor of finding a health-care nexus. *See id.* at 499–500.

The regulations that Belmont Village refer to are no different from those in *Ramirez* or *Reddic*. Some are inapplicable. *See, e.g.*, 40 TEX. ADMIN. CODE § 92.125 ("train[ing] to report abuse").[7] Others are merely general regulations that do not differ from general standards of tort liability. *See* TEX. HEALTH & SAFETY CODE § 247.001 (requirement to provide "humane treatment" and "safe surroundings"); 40 TEX. ADMIN. CODE § 92.125 (requirement to keep a patient "free from physical and mental abuse").[8] An apartment complex has those same duties under the general standards of tort liability. *See, e.g.*, *Weingarten Realty Mgmt. Co. v. Liberty Mut. Fire Ins. Co.*, 343 S.W.3d 859, 874 (Tex. App.—Houston [14th Dist.] 2011, pet. denied) ("A landlord who retains the right to control the security and safety of the premises owes a duty to a tenant's employees to use ordinary care to protect the

---

[7]   Effective May 1, 2019, *see* 26 TEX. ADMIN. CODE § 553.41(4)(A)(i) (requiring staff training on topic of "reporting of abuse").

[8]   This provision was transferred to 26 TEX. ADMIN. CODE § 553.125(a)(3) effective May 1, 2019.

25

employees against an unreasonable and foreseeable risk of harm from the criminal acts of third parties.") (citing *Centeq Realty, Inc. v. Siegler*, 899 S.W.2d 195, 197 (Tex. 1995), and *Exxon Corp. v. Tidwell*, 867 S.W.2d 19, 22–23 (Tex. 1993)). Belmont Village has not shown regulations that are unique to assisted living centers that go beyond "the same standards" applicable to businesses generally. Nor has it shown that compliance with those special standards caused the sexual assault. *See Galvan*, 476 S.W.3d at 432.

And, importantly, Belmont Village has not shown or provided a record that establishes a healthcare nexus for the absence of a lock on the door of Charlotte's unit. *See Brazos Presbyterian Homes, Inc. v. Rodriguez*, 468 S.W.3d 175, 180 (Tex. App.—Houston [14th Dist.] 2015, no pet.). The contract provides in pertinent part:

> For your safety and comfort, Belmont Village's staff must be permitted to enter your Residence to perform basic housekeeping services, respond to emergencies, deliver services, and make repairs and improvements, as Belmont Village deems necessary or advisable. Therefore, additional locks are not permitted on the entrance door to your residence.

Nothing in the record establishes that the absence of a door lock was necessary to provide health care to Charlotte. Neither the contract, nor any evidence, describes the referenced "emergencies" or "services." *See Ramirez*, 539 S.W.3d at 498 (holding that party moving for dismissal has burden of proving that cause of action is health care liability claim and that, if record does not affirmatively make this showing, the statutory expert-report requirement does not apply).

26

Finally, although we recognize that the extent to which expert testimony from a health care professional is necessary to support a plaintiff's claim is not determinative of this issue, it is nevertheless a relevant consideration in deciding whether a safety-standard claim is a health care liability claim. *See Tex. W. Oaks Hosp.*, 371 S.W.3d at 182; *Pallares v. Magic Valley Elec. Co.-op., Inc.*, 267 S.W.3d 67, 74–75 (Tex. App.—Corpus Christi 2008, pet. denied). Belmont Village's alleged failure here does not require an expert to explain, and nothing in the record indicates that an expert report would aid the trial court in determining whether the Marshalls' claim is meritorious. *See Ross*, 462 S.W.3d at 502 ("The purpose of the TMLA's expert report requirement is not to have claims dismissed regardless of their merits, but rather it is to identify and deter frivolous claims while not unduly restricting a claimant's rights. And the Legislature did not intend for the expert report requirement to apply to every claim for conduct that occurs in a health care context.").

In sum, the *Ross* factors do not weigh in favor of Chapter 74's applicability. Accordingly, we conclude that the record in this case does not show a substantive nexus between the Marshalls' claim relating to the safety and security of Charlotte's unit and Belmont Village's providing of health care. *See Ross*, 462 S.W.3d at 505; *Brazos Presbyterian Homes, Inc.*, 468 S.W.3d at 180. In light of our conclusion that Belmont Village failed to establish that the Marshalls' claim concerns health care or

27

safety standards related to health care, we need not address the third element of a TMLA claim—whether the complained-of omission proximately caused the injury to the claimant. *See Bioderm*, 426 S.W.3d at 758 ("No one element, occurring independent of the other two, will recast a claim into a health care liability claim."). And, because Belmont Village failed to meet its burden to affirmatively demonstrate that the Marshalls' claim is a health care liability claim, the expert report requirement does not apply, and the trial court did not abuse its discretion in denying Belmont Village's motion to dismiss. *See Ross*, 462 S.W.3d at 505; *Ramirez*, 539 S.W.3d at 498.

## Conclusion

We overrule Belmont Village's sole issue and affirm the trial court's order denying Belmont Village's motion to dismiss.

Richard Hightower
Justice

Panel consists of Justices Kelly, Hightower, and Countiss.